MORRIS N. PALMER RANCH
COMPANY

v.

Ross J. CAMPESI.

Civ. A. No. 77-6-A.

United States District Court,
M. D. Louisiana.

March 24, 1980.

Patrick W. Pendley, Freeman & Pendley, Ltd., Plaquemine, La., for plaintiff.

F. Barry Marionneaux, Marionneaux & Marionneaux, Plaquemine, La., for defendant.

E. GORDON WEST, District Judge:

This case is within the federal jurisdiction because it is an action between a citizen of Louisiana and a citizen of a foreign state, U.S.Const. Art. III, Section 2; 28 U.S.C.A. Section 1332(a)(2).

Plaintiff, the Morris N. Palmer Ranch Company of Alberta, Canada, brings suit against Ross J. Campesi of Louisiana for the unpaid portion of the purchase price of a herd of 476 registered Maine-Anjou cattle; for the balance due on another smaller sale of cattle; for the price of Maine-Anjou semen sold for use in breeding the animals; for costs incidental to the sales; and for attorney's fees together with appropriate interest on the amounts owed.

Ross Campesi, defendant, claims that the cattle were not as represented in several respects and that as a result he suffered damages in excess of the amount of the purchase. The semen, he claims, was to have been provided to him without charge as part of the inducement for the sale.

The original contract of sale here involved having been executed by these parties while both were physically present at

the plaintiff's ranch in Canada, it would appear that, under the usual and familiar conflicts of law rule, Canadian law might be expected to govern the rights and duties of the parties subject to the terms of that contract. However, throughout this litigation, both parties have argued the case in accordance with and in reliance upon Louisiana law. Neither party has at any time even suggested that the law of Canada would govern this dispute. It is perfectly permissible for them to have agreed to be bound by the law of this forum, and we find that they have done so and therefore Louisiana law will be applied herein.

## SUMMARY OF THE FACTS

In December of 1974, the defendant took delivery of 461 head of cattle, many of them pregnant cows. These represented all but 15 of a herd of 476 which he had bought at an agreed sale price of $604,500 and on which a down payment of $60,450 had been made, the rest to be paid in future installments beginning in July of 1975. The price was considerably higher than is usually paid for ordinary cattle because these were specialty animals, registered Maine-Anjou cattle. As security for payment of the price, the buyer delivered to the seller a livestock collateral chattel mortgage in the amount of $1,000,000 and a collateral mortgage note of like amount. Six promissory notes maturing at six month intervals represented the balance due. The seller was secured by a policy of insurance covering the particular sale issued by the Canadian Export Development Corporation. None of the installments has ever been paid.

As a defense to the seller's claim for the unpaid balance due, and as the basis of an independent claim for damages, defendant makes the following complaints:

1. On approximately one-fourth of the animals in the herd tattoos, brands and tags were not legible enough to allow matching of particular animals with their registration papers.

2. On another one-fourth of the herd, the sire indicated on the registration certificate was allegedly proved by blood test not to be the sire in fact.

3. Only 141 of 200 animals sold as bred heifers or cows actually bore calves.

At trial, the testimony of plaintiff's expert, Forrest E. Walters (trial transcript pages 349–50), and defendant's expert, Dr. Russell L. Schelkopf (transcript pages 232–3), was in agreement that during 1975, after the sale of these cattle, the market price of all cattle and particularly of cattle of this kind, began to decline and fell dramatically, reaching its nadir sometime in 1976.

The default of the defendant apparently occurred in July of 1975, well after the drastic decline in the market value of the cattle had commenced.

It is convenient at this time to note that the average price per animal involved in this sale was $1,270. By contrast, the value of an ordinary commercial cow during the time in question was approximately $300, according to the testimony of Dr. Schelkopf (transcript page 228) which stands uncontradicted.

In August of 1976, some time after defendant's alleged default, the parties executed an agreement styled "1976 Agreement," the validity and effect of which is also at issue in this suit.

Since the defendant claims that the 1976 Agreement amounted to a complete compromise of the parties' differences arising from the original contract of sale, consideration of that agreement should precede consideration of the validity of the original sale.

## THE 1976 AGREEMENT

■ After Mr. Campesi failed to pay anything towards the price of these cattle when the first payment was to have been made in July of 1975, the parties entered into negotiations. These negotiations resulted in the confection of an agreement signed by both parties and styled "1976 Agreement." This document is filed in the record as Defendant's Exhibit 10. It provides that upon its entry into force, the buyer shall pay to the seller $200,000. The seller is reciprocally obligated to cancel the livestock collateral chattel mortgage and

promissory notes already described and cancel the contract of insurance with Export Development Corporation, repaying all funds previously received thereunder. The balance remaining due was to be paid in annual installments from the sale of progeny of the cattle here concerned, which cattle were to be kept together in Louisiana by the buyer, who was required to make regular reports to the seller concerning the number of cattle in the herd and the amount of money realized from the sale of animals during the term of the agreement.

The agreement as described quite evidently was limited to considerations of the time and manner of payment. The buyer's claim that he was entitled to a reduction in the price, which, apparently, had not yet been clearly articulated, was left unresolved as indicated by the express provision that "appearers acknowledge and agree that all rights, defenses and warranties previously existing under the terms of the original Livestock Sale Agreement in favor of both appearers are hereby preserved . . ." We originally had some doubt whether a contract setting forth terms for the payment of money pursuant to a sale, which appeared to leave open the amount payable, could be any contract at all. On reflection, however, we are convinced that the price is adequately set forth. The amount due is, and was agreed to be, the original sum ($604,500 less payments already made) subject to such a reduction or adjustment as the buyer might show himself entitled as a matter of law.

The date set for the entry into force of the agreement having passed, the buyer, through his attorney, contacted the seller, by letter, which was read into evidence at trial (trial transcript pages 26–8) stating his understanding that the agreement was in effect and declaring that he was "ready, willing, and able" to pay the $200,000 due under its terms. Mr. Palmer replied, declaring that the agreement could not enter into force until Mr. Campesi consented to an audit of his affairs to assure his creditworthiness. The buyer insists that the agreement requires no such audit, but claims further that he never refused to permit an audit to be made, but merely refused to pay for one himself.

We find no support in the document itself for the contention that an audit was required for its entry into force. Nothing in the language of the agreement suggests that it was to be modified or affected by matters not contained therein. The agreement was drawn up by the parties with the active participation of their attorneys, who, if the many marginal notations and emendations contained therein are any indication, labored painstakingly over its terms. Since the written agreement makes no mention of an audit, this court will not infer that one was required. The unsupported and self-serving assertion of Mr. Palmer that an audit was an essential ingredient of the agreement is insufficient to persuade us in light of the complete absence of any mention of such a requirement in the body of the document itself. We find that Mr. Palmer's reliance on the absence of an audit to avoid his obligation under the 1976 Agreement was misplaced.

Palmer's additional claim that he was never put in default on the contract because a tender of the $200,000 due him from Mr. Campesi was never made in cash, is baseless. On the date specified for the entry into force of the agreement, Mr. Campesi declared himself "ready, willing, and able" to deliver the money. Mr. Campesi had earlier given satisfactory proof of his ability to obtain the necessary sum in the form of a bank letter of credit. Indeed, Palmer does not deny that Campesi was both able and willing to pay at the appropriate time and place, but tries to make the technical point that Campesi never came forward with the actual cash in hand. We think it would be unreasonable to expect Campesi to carry a sum of cash to Palmer in Canada, especially where its refusal may have been foreseen by him. We find as a fact that Campesi did all that he could do to perform his part of the contract and that his timely offer to perform, accompanied by proof of his ability to do so sufficiently placed Palmer in default, Civil Code Article 1913. See *Fox v. Doll*, 221 La. 427, 59 So.2d 443 (1952).

(A demand in writing used to put in default a vendor who has not performed by the time for performance need not be in any particular form and it is sufficient that the notification contain demand of performance by vendor and announce a readiness of purchaser to perform.) See also *Wilbor v. McGillicuddy*, 3 La. 382 (1832). (Where, in action for breach of a contract, plaintiff alleged a readiness on his part to comply with the terms of the contract, and a refusal by defendant to comply with its terms, and where defendant did not deny plaintiff's ability to fulfill his agreement, plaintiff was not required to prove his ability to carry out the contract.)

The 1976 Agreement was the law between the parties at the time of Mr. Palmer's breach of it. The question of damages suffered by the buyer on account of that breach will be taken up below, after disposition of other matters.

Since the 1976 Agreement specifically provided for the preservation of warranties and rights under the original contract of sale, our finding that it was an enforceable contract at the time of its breach by Mr. Palmer leaves open the question of the merits of the buyer's claim of defects in the objects of sale.

### DEFENDANT'S CLAIM THAT THE CATTLE COULD NOT BE IDENTIFIED

■ Defendant maintains that the identifying marks on approximately one-fourth of the herd were illegible. Even if this were so, it would be a characteristic of the animals which would have been apparent and obvious on simple inspection, and therefore not a redhibitory vice such as would, of itself, support a claim for return of the price or reduction of the price, *Magee Motors, Inc. v. Guerdon Ind., Inc.*, 328 So.2d 761 (La.App.1976); *Ford v. Broussard*, 248 So.2d 629 (La.App.1971); *Bonhagen v. Hooper*, 195 So.2d 447 (La.App.1967). This principle is long established in Louisiana's law of sales. See *Decuir v. Packwood*, 5 Mart. (O.S.) 300 (La.1818). "If one purchases a crop of sugar after viewing it, he cannot claim any abatement on account of its inferior quality."

■ Additionally, it appears to us that the buyer's difficulty in reading the identification marks derives from an over-nice approach to the problem. The buyer refused to accept ear tags as an alternate means of identification of animals, since he apparently did not consider them "permanent identification." (Trial transcript page 195). The buyer also refused to directly compare tattoos and registration papers while making the identifications, arguing that if he knew in advance, from reading the identification paper, what number was supposed to be on the animal, he would be inclined to read the tattoo or brand that way despite its actual illegibility. "Because if I have a piece of paper that says in black and white a set of numbers, if I walk up to an animal and look at it, and if I suspect that these numbers might fit, I can say, 'By Golly, that's it.'" (Trial transcript page 214.) We are not impressed by this quibbling and find it not proved that any of the animals here involved were not identifiable within acceptable tolerances, especially considering that tattoos and similar markings become gradually illegible in time and that these animals have been in the possession of the buyer for several years without being paid for. In this regard we are particularly impressed by the testimony of Mr. Michael Thomas (trial transcript page 311) that the identifying marks on the animals were all old at the time of his examination and that the system of identification has received no maintenance while the animals were in Mr. Campesi's hands. Mr. Thomas further testified (trial transcript pages 314–15) that despite the faded or smeared brands and tattoos he had been able, by combining several identification methods, to identify all the cattle examined by him.

We find no merit to defendant's claim that the animals delivered to him by Palmer Ranch were unidentifiable insofar as matching animals with registration papers is concerned.

### DEFENDANT'S CLAIM THAT THE REGISTERED SIRES WERE NOT THE SIRES–IN–FACT

■ Defendant has satisfactorily proved that some of the animals involved in this

suit were not the offspring of the registered Maine-Anjou bulls listed on their registration certificates. Of 45 vials sent to the serology laboratory of the University of California at Davis, 11 contained blood of a type genetically incompatible with the blood type of the registered sire of the animal from which the sample was taken. In 7 of these 11 cases it was noted that the blood types *were* compatible with those of other Maine-Anjou bulls used by the Palmer Ranch or otherwise available to the dam of the animal in question. We cannot accept these alternative matchings as reliable evidence that the animals in question were sired by a registered Maine-Anjou bull. The evidence was uncontradicted that the blood tests in question can only exclude and not establish parentage. It may be that many thousands of bulls in the world have blood types which would not exclude them as possible sires of these cattle. We note especially the testimony of Silver Ziebarth (Ziebarth deposition pages 36–7) that the Quebec Cooperative Farms from which about half of the cattle in question originated, have a high rate of uncertainty as to pedigree because their operations are carried on by numerous independent farmers, are not subject to scientific supervision, and involve different breeds of cattle which could easily be mixed in breeding by A.I. (Artificial Insemination) technicians who go into the field carrying vials of semen from more than a single breed.

We therefore find that at least 11 out of 45 or 24.4% of the animals whose blood was in the sample sent to Davis were not what they were represented to be. The fact that these animals could still apparently have been registered with the American Maine-Anjou Association as half bred Maine-Anjou cattle we consider of no account. The testimony of Mr. John Buchen, Executive Secretary of that association, was to the effect that the organization has practically no checks on the reliability of the information submitted to it on bloodlines and parentage of particular animals. The association, he testified, relies almost entirely on the integrity of its members (trial transcript page 289). That being so, the members cannot rely on the certification of the association to establish anything more than their own assertion of a fact would be worth.

There was expert testimony presented to the effect that the figure of 24.4% listed above as the failure rate on blood type matching should not be extended to the entire herd of 476 animals, because many had been disposed of at the time the samples were collected. The animals which had already been sold, it was suggested, were likely of a better quality than the animals retained, because if they sold, they were likely to be the most salable animals. We are not persuaded by this argument and accept instead the contrary testimony that the sample sent in was fairly representative of the entire herd. There is no evidence at all to suggest whether Mr. Campesi sold his best animals, his poorest animals, the animals from a particular field or just the first animals to come to hand. Besides, we are unwilling to limit further the effect of proof which may have already been given less effect than it deserves. The figure of 24.4% represents the proportion of the sample on which the representation of parentage by the seller on the registration certificates was *proved* wrong. With such a high failure rate, it seems to us likely that many other of the listed sires in the sample may not have been the sires-in-fact of their putative offspring, but, since blood types were not positively incompatible, this could not be proved. We are reinforced in our conviction that the blood test results of the defendant are reliable by the proof offered that after these tests were made and their results known, the plaintiff had blood samples drawn by his own experts, but chose not to send them in for testing. We therefore conclude that 24.4% of the animals purchased and received by defendant were not as represented by the seller.

## DEFENDANT'S CLAIM THAT THE COWS WERE NOT ALL PREGNANT

The defendant claims that of 200 cows sold to him as bred, only 141 eventually bore calves. We think this claim has not been established by a preponderance of the

evidence. The expert testimony of Mr. Bruce Bainbridge, based on the buyer's calving records, persuades us that the calves were coming at expected intervals, and stopped suddenly, according to the records, indicating not that no further calves were born, but that records ceased to be kept of these births contemporaneously with the decline in value of the animals and the development of the conflict between these parties. We find no merit to this claim.

### DEFENDANT'S CLAIM THAT THE SEMEN WAS TO HAVE BEEN PROVIDED FREE

■ The claim for the price of semen being a relatively small item in the context of this litigation, the record contains very little evidence relative to it. The defendant claims that the semen was to have been provided free as part of the inducement for the sale. We regard this claim as unsupported. Plaintiff's Exhibit 18 is an invoice for $1,090.00 worth of semen dated virtually contemporaneously with the sale of cattle in question. Plaintiff's exhibit 19 is another invoice for more semen dated eight months later. Nothing in the record indicates that these billings were questioned at the time they were made. The terms of the invoices require full payment within ten days of receipt. We find that the full amount is due and owing.

### ANIMALS NEVER DELIVERED

■ It appears that the original Livestock Sale Agreement (Plaintiff's Exhibit 5) called for the sale of 476 cattle at a total price of $604,500. The evidence shows that only 461 animals were actually delivered. The shortage evidently arose because the herd had to be very quickly assembled and passed over the Canadian border during a short period of time during which cattle crossings were permitted. The border had been closed to cattle for long periods because of customs disputes between the two nations. Ordinarily, a seller who fails to deliver the thing sold timely is subject to an action in damages on behalf of the buyer, Civil Code Article 2486. The seller is ex-cused from damages, however, where the intervention of the government prevents delivery, *Denny v. Simons*, 27 La.Ann. 438. (The interference of the military, which prevented the delivery of the merchandise purchased, relieved the obligor from penalties, but he must return the price received by him.)

■ We think that the buyer is entitled to a credit equal to the sale price of these undelivered cattle. The 15 undelivered cattle consisted, according to the records of the Palmer Ranch set out in Document # 3 filed in the record of this case, of 11 half-blood Maine-Anjou Heifers (Open) and 4 three-quarter blood Maine-Anjou Heifers. The Livestock Sale Agreement (Plaintiff's Exhibit 5) sets forth that the sale price of the open half-blood heifers was $1,000. The sale price of ¾ blood heifers was $2,000 for BLACKS and $2,500 for REDS. No evidence of record indicates whether the 4 undelivered ¾ blood heifers were BLACKS or REDS. Averaging, therefore, the price of the 6 BLACKS and 15 REDS supposed to have been included in the original sale yields an average price per animal of $2,357 for a ¾ blood heifer. The total sale price of the 15 undelivered cattle was therefore 11 × $1,000 + (4 × $2,357) = $20,428. Defendant is entitled to a credit of this amount.

### DEFENDANT'S CLAIM FOR LOST PROFITS

■ The defendant claims that due to the fact the cattle were not as represented, he sustained several hundred thousand dollars in lost profits. A vendor in good faith of an object with a redhibitory vice is only liable for the return of the price and expenses of the sale and preservation of the thing, Louisiana Civil Code Article 2531. This record is void of any evidence that the seller acted in bad faith. It appears that the cattle whose parentage is in question were mostly obtained by the vendor from cattle farmers in Quebec who seem not to have been as careful as they ought to have been about breeding practices or record keeping. Ross Campesi testified that he

was unaware of this at the time of sale and assumed that he was buying all cattle produced on the Palmer Ranch, but he nowhere says that Palmer ever misrepresented the facts on this issue. The claim of lost profits is also highly dubious in view of the poor state of the cattle market during the time in question. Because the claimed loss of profits has not been proved, and because the loss would not be recoverable in law if proved, the claim will be disallowed.

## DEFENDANT'S CLAIM FOR MAINTENANCE EXPENSES

■ Defendant claims maintenance expenses of over one hundred thousand dollars for the cattle in question during the pendency of this dispute. Since we find the purchaser not entitled to a rescission of the sale but only to a reduction in price, we do not find him entitled to reimbursement of his maintenance costs. The evidence in this case strongly supports the court's conclusion that the buyer retained the cattle and failed to pay for them more because of the decline in their market value, a risk he assumed in the purchase, than because of defects in the animals. After his default in payment and after the market decline, the buyer suddenly discovered what he now claims to be serious defects in the cattle sold to him. But we find that this discovery played no significant part in his decision to hold onto the animals, thus incurring expenses for their maintenance. Therefore these expenses are not recoverable. The Louisiana action for reduction of the purchase price, unlike the action for rescission of the sale, makes no provision for payment for expenses of preserving the thing. Under La. Civil Code Article 2543, when a party claims a right of redhibition, the court is entitled to decree instead a reduction in price where the defect proved is not such as to render the thing totally useless for its intended purpose, see *Davis v. Davis*, 353 So.2d 1060 (La.App.1977); *Wolfe v. Henderson Ford, Inc.*, 277 So.2d 215 (La.App.1973).

## PLAINTIFF'S PLEA OF PRESCRIPTION

■ The plaintiff says that the defendant's claim in redhibition has prescribed under Civil Code Article 2535. Beyond doubt the two month period there provided has long passed. But the jurisprudence of Louisiana is clear that a prescribed redhibitory action can be set up as a defense to suit for the unpaid balance of the price of the defective thing, *D. H. Holmes Co. v. Smith*, 235 So.2d 159 (La.App.1970). Therefore, in the context of this suit, there is no merit to plaintiff's plea of prescription.

## CONCLUSIONS

For the reasons stated herein, the court finds that defendant agreed to pay $604,500 for 476 animals, or an average price of $1,270 per animal. We conclude that 24.4% of the animals delivered, or 112 animals, were defective, or at least not as represented, justifying a reduction in the purchase price. Since the prevailing price of a commercial cow at that time was $300, we conclude that the defendant is entitled to a reduction in the price of 112 animals from $1,270 to $300, or a total reduction of $108,640, on the price of the delivered cattle. In addition thereto, defendant is entitled to a reduction of $20,428 for the undelivered 15 cows. And, of course, defendant is entitled to a further credit of $60,450 representing the down payment at time of purchase, leaving a balance due on the original contract of $414,982.

The defendant does not deny, and the evidence adequately proves that the defendant owes a balance of $15,100 on two other contracts for the purchase of cattle, one dated November 18, 1974, and one dated October 27, 1975, and consequently plaintiff is also entitled to recover that amount. Plaintiff is further entitled to recover the amount of $5,340 for semen sold to defendant and as yet not paid for.

Defendant does not deny, and the evidence proves, that he owes the plaintiff $17,644.36 for freight and shipping costs which, by the express terms of the contract, were to be paid by defendant. Plaintiff has paid these costs and is now entitled to recover them from the defendant.

This makes a total of $453,066.36 for which we find the defendant liable to the plaintiff.

### THE 1976 AGREEMENT REVISITED

We must now consider what, if any, effect the 1976 Agreement has on the method of payment of this indebtedness. Since we have concluded that the 1976 Agreement is, in fact, a valid and enforceable agreement, subject to its terms and reservations, we now conclude that the defendant, pursuant to the obvious intent of that agreement, would have been entitled to the benefit of installment payments had both parties performed pursuant to the terms of the agreement. The evidence supports the conclusion that the 1976 Agreement contemplated a liquidation of defendant's indebtedness over a period of time. Exactly what the length of time contemplated was is difficult to determine from the evidence. It could, according to some of the evidence, have been less than five years, or it could, as contemplated by defendant, been as long as ten years. The 1976 Agreement did not itself provide for interest on the deferred payments so we assume that none was contemplated. But in any event, no payments whatever have been made by the defendant as contemplated by the agreement, and consequently he has had the use of money that otherwise would have been available to plaintiff for almost four years. We now conclude that the defendant has in fact had the benefit of deferred payments as reasonably contemplated by the 1976 Agreement, and consequently the amounts hereby awarded to the plaintiff shall be due and payable as of the date of this judgment, and shall bear interest at the legal rate from date of judgment until paid. If he has not already done so, plaintiff shall release and cause to be cancelled the Livestock Collateral Chattel Mortgage and the promissory notes given in connection therewith, and shall also repay all money received from the Canadian Export Development Corporation under the contract of insurance owned by plaintiff covering the sale of the cattle here involved, and plaintiff shall also cancel that insurance contract, all as required by the 1976 Agreement.

Judgment will be entered accordingly.

### JUDGMENT

For reasons this day assigned and filed in the record of this case:

IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of the plaintiff and against the defendant in the sum of $453,066.36, together with interest at the legal rate from date of judgment until paid, and for all costs of this suit.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that upon this judgment becoming final, the plaintiff, if he has not already done so, shall cause to be cancelled that certain Livestock Collateral Chattel Mortgage dated January 21, 1975, in the amount of $1,000,000, which was filed in Iberville Parish, Louisiana, together with the collateral mortgage note and promissory notes dated January 16, 1975 given in connection therewith, all as referred to specifically in the 1976 Agreement, and, if he has not already done so, plaintiff shall further cause to be cancelled the contract of insurance between himself and the Export Development Corporation (Policy No. 324–3–2564–01–75–A–00 dated February 14, 1975), and repay to Export Development Corporation all funds previously received by plaintiff pursuant to that contract of insurance.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of defendant, denying plaintiff's demand for attorney fees.