MORRIS N. PALMER RANCH COMPANY, Plaintiff-Appellant Cross-Appellee,

v.

Ross J. CAMPESI, Defendant-Appellee Cross-Appellant.

No. 80–3313.

United States Court of Appeals, Fifth Circuit.

Unit A

June 12, 1981.

Patrick W. Pendley, Plaquemine, La., for defendant-appellant cross-appellee.

Marionneaux & Marionneaux, F. Barry Marionneaux, Plaquemine, La., for defendant-appellee cross-appellant.

Before BROWN, WISDOM, and RANDALL, Circuit Judges.

WISDOM, Circuit Judge:

This is a diversity case to be decided under Louisiana law. It involves a branch of the cattle industry that has experienced strong growth in recent years—the breeding of exotic breeds. Because the market for exotic breeds declined significantly in 1975, the defendant was unable to pay the plaintiff for over 500 head of Maine-Anjou cattle he had purchased just before the decline. The plaintiff sued. The district court reduced the purchase price because the bloodlines of some of the cattle were not what they were represented to be, but otherwise substantially enforced the obligations the defendant had undertaken. M.D. La.1980, 487 F.Supp. 1062. We affirm in most respects, but modify the district court's judgment concerning the amount of prejudgment interest owed to the plaintiff.

## I.

The plaintiff, Morris N. Palmer Ranch Company, breeds and raises cattle in Alberta, Canada. The defendant, Ross J. Campesi, is a Louisiana cattle rancher. In December 1974, Campesi purchased from Palmer a herd of 476 Maine-Anjou cattle, a breed with French bloodlines. He received all but fifteen of those cattle at that time. The purchase price was $604,500. Campesi paid ten percent of the total purchase price as a down payment and executed six promissory notes, each representing one-sixth of the balance. The maturity dates of the notes were set at six-month intervals so that the payout scheme amounted to six semiannual installments; the first was due in July 1975. The notes were secured by a $1,000,000 collateral chattel mortgage on the cattle.

Campesi failed to pay any of the notes as they came due. In December 1976, Palmer and Campesi entered into an agreement (1976 Agreement) designed to replace the payout schedule represented by the six promissory notes. The 1976 Agreement called for an immediate payment of $200,-

000. The balance of the amount still due on the original price was to be paid yearly out of the proceeds Campesi earned from the sale of the herd's progeny. The six promissory notes as well as the chattel mortgage were cancelled.

Campesi tendered the $200,000 called for in the 1976 Agreement, but Palmer refused to accept it, contending that an audit was an implied condition of the 1976 Agreement. When Campesi refused to pay for an audit, Palmer initiated this suit in January 1977 seeking the purchase price of the 476 cattle, the unpaid balance on two other smaller cattle purchases made by Campesi, the purchase price of semen used for breeding, and incidental expenses connected with transportation of the cattle from Canada to Louisiana.

Campesi's liability for the purchase price of the largest herd was the focus of the litigation. Campesi alleged that the herd suffered from several redhibitory defects: some of the cattle did not have the blood lineage they were represented to have, the identification markings on many of the cattle were poor, and a number of cattle sold as pregnant heifers failed to bear offspring. On the basis of these redhibitory defects, Campesi counterclaimed for rescission of the sale or, alternatively, a reduction of the purchase price. He also sought lost profits, maintenance expenses, and attorneys' fees.

The district court, in a carefully reasoned opinion, found that the 1976 Agreement went into effect notwithstanding Palmer's refusal to accept the $200,000 Campesi tendered. The court further found that 24.4 percent of the herd had bloodline problems and that fifteen cattle had never been delivered, but rejected all of Campesi's counterclaims except the claim for a reduction of the price. The court concluded that Campesi owed Palmer $453,066.36 plus interest commencing on the date of judgment. That figure represented the sum of the unpaid amounts Campesi owed on all the contracts of sale between the parties, together with incidental expenses, less a reduction in price for the undelivered cattle and the cattle having defective bloodlines in

the large herd. The plaintiff appealed from the court's decision to reduce the price and the court's failure to award him prejudgment interest; the defendant cross-appealed from the court's refusal to rescind the entire sale and the court's denial of recovery for lost profits and maintenance expenses.

## II.

Both Palmer and Campesi wish us to review the district court's rulings concerning Campesi's defenses and claims in redhibition. Redhibition and its close ally, the action for reduction of the price (the action in *quanti minoris*), are governed by Louisiana Civil Code articles 2520 to 2548. Redhibition is defined as "the avoidance of a sale on account of some vice or defect in the thing sold, which renders it either absolutely useless, or its use so inconvenient and imperfect that it must be supposed that the buyer would not have purchased it, had he known of the vice". La.Civ.Code art. 2520. A seller who is unaware of the defect is bound to repair the defect, but if he is unable to repair it, he must return the purchase price and reimburse the buyer for any maintenance expenses incurred. *Id.* art. 2531. Where the defects complained of do not rise to the level necessary to sustain redhibition, the buyer may seek a reduction in the price, *id.* art. 2541, and this action is governed by the same rules as the action for redhibition. *Id.* art. 2544. *See generally* Barham, *Redhibition: A Comparative Comment*, 49 Tul.L.Rev. 376 (1975); Comment, *A Comparison of Redhibition in Louisiana And the Uniform Commercial Code*, 19 La.L.Rev. 165 (1958); Comment, *Warranty of Quality in Louisiana: Nature and Proof of the Implied-In-Law Warranty*, 23 Tul.L.Rev. 96 (1948).

## A.

Campesi first challenges the district court's conclusion that the problems with the identification markings (tatoos, brands, and tags) on one-fourth of the herd did not constitute a redhibitory defect. The court offered two bases for its conclusion. It

found that the problems, if any, could have been discovered by simple inspection at the time of the sale and therefore could not serve as defects justifying either redhibition or a reduction in price. La.Civ.Code arts. 2521, 2544;[1] *Magee Motors, Inc. v. Guerdon Industries, Inc.*, 1976 La.App., 328 So.2d 761. In addition, the court found that Campesi had failed to prove the existence of a redhibitory defect in the identification markings. Although some of the markings were illegible, this was in large part attributable to Campesi's failure to maintain the markings during the three years between the date of delivery and the date when his expert inspected the cattle. Even Campesi's expert witness admitted that markings become illegible with the passage of time. Furthermore, Campesi failed to establish that even a single cow with an illegible marking could not be identified and matched with its registration papers by some alternative markings. We have examined the record and find ample support for both of the court's conclusions with respect to the identification markings.

Campesi also contends that the court erred in failing to reduce the price of the sale because about 60 cattle sold as bred heifers never bore offspring. The court found that Campesi did not prove this claim either. To support his claim, Campesi offered his calving records showing that only 141 of the 200 bred heifers bore calves. Palmer countered with expert testimony and artificial insemination records. His evidence established that births in the herd were proceeding in accordance with projections based on the artificial insemination dates of the heifers until the births abruptly ended, an unusual phenomenon in a herd of that size. The court concluded that the abrupt break in the birth records indicated, not that the calving ended, but that the recordkeeping ended. The testimony of Gale Mettenbrink provides further support for this conclusion. Mettenbrink was employed by Campesi and had control of the whole herd in Nebraska during the early

months of 1975 immediately after the herd was purchased. He kept the calving records upon which Campesi bases his claim. The herd was split in late April 1975, however, when over half the herd was shipped elsewhere. Mettenbrink's calving records ceased precisely at that time. The district court's finding is supported by the record and is therefore not clearly erroneous.

**B.**

Campesi and Palmer both disagree with the court's findings concerning the existence and extent of bloodline defects. Campesi contends that 24.4 percent of the herd were found by a serology laboratory not to have been sired by the bull on the registration certificate. He argues that the defects found by the court were substantial enough to justify rescission of the entire sale rather than the reduction in purchase price ordered by the district judge. Palmer on the other hand contends that the evidence of bloodline defects was not strong enough to support all of the reduction awarded by the district judge.

■ There are two answers to Campesi's contention. First, a buyer who wishes to rescind the sale must be in a position to return the purchased item. *J. B. Beaird Co. v. Burns Bros.*, La.1949, 216 La. 655, 44 So.2d 693; *Stratton-Baldwin Co. v. Brown*, La.App.1977, 343 So.2d 292, 297. If the buyer has resold the thing, he is not entitled to rescission. *J. B. Beaird Co. v. Burns Bros., supra.* Campesi had resold part of the herd, and some of the cattle had died (through no fault of Palmer's), making Campesi unable to return the herd intact. He therefore cannot obtain a full rescission of the sale, but rather must settle for a reduction in price. *E. g., Bendana v. Mossy Motors, Inc.*, La.App.1977, 347 So.2d 946, 950; *Stratton-Baldwin Co. v. Brown, supra. See generally* Comment, *Warranty of Quality in Louisiana: Extent of Recovery Under the Implied-In-Law Warranty*, 23 Tul.L. Rev. 130 (1948).

1. Even though article 2521 of the Louisiana Civil Code by its terms applies only to actions for redhibition, article 2544 applies article 2521, along with all other rules governing redhibition actions, to the action for reduction of the price.

■ The second answer goes directly to the merits. Rescission is proper only where the defect renders the thing sold either absolutely useless or so substantially useless that the buyer would not have bought it had he known of the defect. La.Civ.Code art. 2520. The court found that defective bloodlines existed in 24.4 percent of the herd. Campesi asserts that this casts such a shadow on the rest of the herd that it renders them valueless or substantially valueless. He offers no evidence to support that assertion. Indeed, Campesi's own expert, in determining the losses Campesi suffered, based all his calculations on the presumption that the untainted cattle were worth full value. We agree with the district court that the defects are not substantial enough to merit rescission.

■ Palmer asks us to reevaluate the evidence on which the court relied in finding that 24.4 percent of the herd had bloodline defects. The evidence on this issue consisted of serology tests conducted on a sample of 45 cattle, about ten percent of the herd. The tests proved that the parentage of eleven of those cattle, 24.4 percent of the sample, was not as listed in their registration papers. Relying on those results, the district court concluded that 24.4 percent of the entire herd had such bloodline defects and therefore had value only as ordinary commercial cattle. The court reduced the purchase price accordingly.

Palmer argues first that the 24.4 percent figure is erroneous because seven of the eleven cattle failing the serology tests were nevertheless proved to be one-half Maine-Anjou cattle, at least to the satisfaction of the American Maine-Anjou Association, a body that keeps registration files for this exotic breed. The blood types of those seven cattle, although incompatible with the blood types of their putative sires, were compatible with the blood types of other Maine-Anjou bulls who could have been the sires. As the district judge pointed out,

however, the serology tests cannot prove parentage; they can only disprove parentage. Furthermore, the doctor who conducted the tests stated that it was entirely possible that the true sires of those seven cattle were not even Maine-Anjou bulls. In light of this evidence, the American Maine-Anjou Association's willingness to register the animals is of little persuasive value. We therefore agree with the district court's conclusion that all eleven animals who failed the serology tests had defects substantial enough to justify a reduction in the purchase price.

Palmer also argues that the test results obtained from ten percent of the herd should not have been applied to the entire herd. Palmer's contention is that the ten percent sample was not reliable because it was composed of cattle chosen from only part of the herd that Campesi had originally purchased. Some cattle in the original herd had died before the tests were conducted, others had been sold. There is nothing to indicate, however, that the sales and deaths had not occurred at random. Moreover, the evidence does establish that the 45 cattle tested were randomly selected. Of further significance is the plaintiff's failure to introduce any contrary test results even though the plaintiff also drew blood samples from the herd. We therefore find no error in the district court's conclusion that the sample was representative of the entire herd. The test results gained from the sample could properly be relied upon to find that 24.4 percent of the entire herd had bloodline defects.[2]

### C.

■ Campesi argues that he should have been awarded the profits he lost because of the defects as well as the maintenance expenses he incurred in raising the defective cattle. Article 2545 provides recovery for lost profits only if the buyer can prove the

**2.** As the district court pointed out, the 24.4% figure for defective bloodlines may well be a conservative one. The serology tests can only disprove parentage; they cannot establish it. A single cow may have a blood type compatible with several potential sires. It is entirely possible, then, that others in the sample may not have had the sires they were represented to have, yet passed the test.

seller had knowledge of the defects and failed to declare them to the buyer. La.Civ. Code art. 2545. Campesi offered no evidence that Palmer had knowledge of the defects. The only shred of evidence bearing on this issue was an admission by Palmer that he knew that parentage problems had occurred in some of the regions of Quebec from which he occasionally purchased cattle. This falls short of proof that Palmer knew that some of the cattle he sold to Campesi had such problems. The district court correctly held that Campesi failed to prove this claim.

■ The court's denial of maintenance expenses is also correct. Campesi attempts to rely on article 2531 of the Louisiana Civil Code which requires, among other things, that the seller reimburse the buyer for expenses incurred to preserve the "thing" having a redhibitory defect. Article 2531 however is grouped with those articles describing the redhibitory action, that is, the action for complete avoidance of a sale. *See* La.Civ.Code arts. 2520–2540. Where a plaintiff is limited to an action for reduction of the price, as Campesi is here,[3] his

action is governed by articles 2541 to 2544. None of those articles contain any specific provisions for maintenance expenses.[4] Moreover, the language of articles 2541 and 2543 indicates that the only r%elief available under this action is a reduction of the price.[5] If the defects do not justify a redhibition, "the buyer may *limit his demand* to the reduction of the price". La.Civ.Code art. 2541 (emphasis added). And even when the buyer seeks redhibition, "the judge may decree *merely* a reduction of the price". La.Civ.Code art. 2543 (emphasis added). We conclude that maintenance expenses are not recoverable when the buyer obtains only a reduction of the price.

### III.

■ The 1976 Agreement entered into by Campesi and Palmer cancelled the notes representing Campesi's indebtedness and substituted a new payout schedule—$200,-000 payable immediately, the balance to be paid down annually out of proceeds from the sale of the herd's progeny. The district court held that the Agreement went into

3. See part II, B of this opinion.

4. Article 2544 does state that the action for reduction of the price is subject to the same rules and limitations as the redhibitory action. But article 2544 is not intended to make article 2531 applicable to the action for reduction of the price. Article 2531 describes the relief available in a successful redhibition action: the seller must repair the defect if possible, but if not, restore the purchase price and reimburse the buyer for maintenance expenses. It would of course be absurd to read article 2544 so as to allow recovery of the entire purchase price as a remedy in the action for reduction of the price; there would then be no difference between the two actions and the buyer could recover the full purchase price regardless of the severity of the defect. It can be argued however that, although restoration of the purchase price is incompatible with the action for reduction of the price, recovery of maintenance expenses is not; therefore, article 2544 should be read so as to allow the buyer to recover maintenance expenses. But this construction of article 2544 would ignore an important distinction between the redhibitory action and the action for reduction of the price. The redhibitory action is designed to return the parties to the status quo ante, that is, to treat the sale as if it never occurred. *See* Comment, *Warranty of Quality*

*in Louisiana: Extent of Recovery Under the Implied-In-Law Warranty,* 23 Tul.L.Rev. 130, 131–32 (1948). The buyer returns the thing sold to the seller and receives the purchase price in return. In addition, the seller must reimburse the buyer for the maintenance expenses incurred after the aborted sale because the seller would have borne those expenses had the sale not occurred. In contrast, the action for reduction of the price is not designed to restore the parties to the status quo ante. The sale has not been rescinded. Instead, the buyer continues to own the thing he purchased, and, like any owner, must bear the cost of upkeep.

5. Article 2541 provides:

Whether the defect in the thing sold be such as to render it useless and altogether unsuited to its purpose, or whether it be such as merely to diminish the value, the buyer may limit his demand to the reduction of the price.

Article 2543 provides:

The purchaser who has contented himself with demanding a reduction of the price, can not afterwards maintain the redhibitory action.

But in a redhibitory suit, the judge may decree merely a reduction of the price.

effect despite Palmer's refusal to accept the $200,000 first payment tendered by Campesi. The court did not put all of the Agreement into effect, however, for it held that the entire amount of the purchase price was payable on the date of judgment rather than in the installments called for in the Agreement. The court, in effect, dissolved the contract. *See* La.Civ.Code arts. 2046, 2047. Campesi argues that the court erred in failing to give full effect to the terms of the Agreement.

We disagree. The 1976 Agreement also required Campesi to fulfill certain obligations during the entire term of the contract. Those conditions included maintaining the herd at a minimum of 500 head of female breeding stock and providing Palmer with quarterly reports setting out an inventory of the herd and all sales of cattle from the herd. The evidence discloses that Campesi failed to perform both of these obligations. The failure to keep records makes it impossible now to determine the amounts of money that should have been paid annually on the balance of the purchase price still due. More importantly, because the herd now numbers less than 400 head of breeding female stock, the number of progeny expected annually from the herd is substantially lower than the Agreement called for. Complete payment of the purchase price, being tied to the sale of progeny, will therefore take substantially longer than the parties envisioned. Performance of the contract—at least the sort of performance bargained for by the parties when the contract was made—is now impossible because Campesi breached these two obligations. Judicial dissolution of the contract is therefore the only appropriate resolution. *See* La. Civ.Code arts. 2046, 2047; *see also* 2 S. Litvinoff, Obligations §§ 263–272 (7 Louisiana Civil Law Treatise Series 1975).

## IV.

■ Finally, Palmer asserts error in the interest awarded by the district court. The court ordered Campesi to pay legal interest, accruing from the date of judgment, on the entire indebtedness still outstanding under all of the sales. Palmer contends that this interest award fails to take into account the interest Campesi owes under the various promissory notes evidencing the indebtedness he incurred for the purchase of the large herd. As to the other indebtedness— the smaller cattle sales, the sales of semen, and incidental expenses—Palmer contends that legal interest should accrue at least from the date of judicial demand, not from the date of judgment.

The Louisiana Civil Code provides for two kinds of interest, conventional and legal. La.Civ.Code art. 1936. Conventional interest is interest agreed to by written contract, and accrues from the time stipulated by contract. *Id.* art. 1937. Legal interest is interest imposed by operation of law; all debts bear legal interest from the time they become due unless otherwise stipulated. *Id.* art. 1938.

In analyzing the interest due on the indebtedness incurred by Campesi to cover the purchase price of the large herd, it is necessary to treat the periods before and after the inception of the 1976 Agreement separately. Before the Agreement, the indebtedness was evidenced by six promissory notes. Interest on all the notes was set at one percent over the prime rate in effect at the Chase Manhattan Bank on the first day of each month. The 1976 Agreement cancelled these notes and set up a new payment scheme. The 1976 Agreement did not specifically set out the amount of the indebtedness it covered, however, and does not otherwise mention the interest that had accrued under the notes. The district court concluded that the amount payable under the 1976 Agreement was the original purchase price, $604,500, less payments already made. This finding is supported by the testimony of Mr. Campesi, and the plaintiff offered no proof to the contrary. It is reasonable to infer then that cancellation of the accrued interest on the six notes was part of the bargain for the 1976 Agreement. At any rate, it was the plaintiff's responsibility to establish his claim to that accrued interest. He has offered no evidence to rebut the inference that the accrued inter-

est was cancelled along with the notes. We therefore conclude that Campesi owes no interest under the promissory notes that originally evidenced the indebtedness for the purchase price of the large herd.

Not only does the 1976 Agreement fail to mention the accrued interest on the cancelled notes, it also makes no provision for the interest rate to be applied during the term of the Agreement. Since conventional interest must be stipulated in writing, La. Civ.Code art. 2924, Palmer cannot recover any conventional interest for the indebtedness covered by the Agreement. He may recover legal interest of seven percent, however, on any debts not paid when due under the terms of the Agreement. La.Civ. Code art. 1938; *see Succession of Drake,* La.App.1978, 359 So.2d 249, 252.

▪ The $200,000 initial payment under the 1976 Agreement was due at the inception of the Agreement. Although Palmer refused to accept the payment when tendered, Campesi did not show that he held the tender open for acceptance by Palmer as he is required to do under Louisiana law. *See* La.Civ.Code art. 2167; [6] *Conklin v. Caffall,* 1938, 189 La. 301, 179 So. 434, 439. Campesi is therefore liable for legal interest on $200,000 from December 1, 1976, the date of the inception of the 1976 Agreement.

▪ Further payments were to be made under the Agreement annually, beginning on December 31, 1977 and continuing until the balance of the indebtedness was paid in full. None of these payments were due at

the time this suit was commenced, but several have since become due and none has been paid. The amount of the payments was not fixed by the Agreement, but was to vary according to the sales of progeny from the herd. Palmer would ordinarily be entitled to legal interest on the payments that became past due during the pendency of this litigation, but he offered no evidence on which the court could rely to establish the amounts that came due.[7] Palmer failed to prove his claim to that interest. He must be denied recovery for it.

▪ Palmer is entitled, however, to legal interest on the indebtedness not covered by the 1976 Agreement—the smaller cattle sales, the sales of semen, and the incidental expenses—from the date of judicial demand. Interest on sales begins to run from the time of sale unless the parties agree otherwise. *See* La.Civ.Code arts. 2550, 2553, 2554, 1938; *McElroy Metal Mill, Inc. v. Hughes,* La.App.1975, 322 So.2d 822, 826. There are indications in the record that Palmer intended to allow Campesi to defer payment on the sales and incidental expenses that constitute the remaining debt. Some correspondence from Palmer to Campesi suggests that this indebtedness was to be subsumed in the promissory notes later cancelled by the 1976 Agreement. Furthermore, there is no indication that Palmer made any demand for payment on these items until he filed this suit, even though some of the bills were outstanding for over two years. But whatever arrange-

---

6. Art. 2167 provides:

When the creditor refuses to receive his payment, the debtor may make him a real tender; and on the creditor's refusal to accept it, he may consign the thing or the sum tendered.

A real tender, followed by a consignment, exonerates the debtor; it has the same effect, with regard to him, as a payment, when it is validly made; and the thing thus consigned remains at the risk of the debtor.

The term "consignment" means depositing funds tendered into the registry of a court in an appropriate proceeding, or otherwise making the funds continuously available to the other party. *Domingue v. Huval,* La.App.1972, 261 So.2d 88, 90.

7. Although Campesi did not fulfill his obligation to keep the records needed to determine the exact amounts of these payments, Palmer could have introduced evidence from which reasonable estimates of those amounts could be gleaned. For example, Palmer could have produced expert testimony on the number of calves a herd of 500 breeding cattle (the minimum number of cattle called for in the 1976 Agreement) should produce annually under normal conditions. That testimony, coupled with some evidence concerning the average market prices for calves during the years in question, would probably have been sufficient.

ments may have existed before the 1976 Agreement, it is clear that the Agreement was meant to defer only the indebtedness for the large herd. Campesi offered no evidence that other credit arrangements were made to defer payment on the other bills after the 1976 Agreement went into effect. We therefore conclude that the remaining indebtedness became due at least at the time the 1976 Agreement went into effect. Palmer's complaint prayed for legal interest on these items from the date of judicial demand, and since those bills were due at that time, he is entitled to it.[8] La. Civ.Code art. 1938.

## V.

For the foregoing reasons, we modify the district court's judgment so that legal interest accrued from December 1, 1976 on $200,-000, from the date of judicial demand on $38,084.36, and from the date of judgment on $214,982, the remaining indebtedness under the 1976 Agreement. In all other respects, the judgment of the district court is AFFIRMED.

---

**8.** Campesi argues that interest cannot accrue on any indebtedness until the amount of the indebtedness is ascertainable. There is support for that position in Louisiana jurisprudence, although the point is not free from doubt. *Compare Alexander v. Burroughs Corp.*, La. 1978, 359 So.2d 607, 613–14 (prejudgment interest denied on attorneys' fees because not ascertainable) *with Paul M. Davison Petroleum Products v. L. T. Brown Contractor, Inc.*, La. 1978, 364 So.2d 583, 584 (prejudgment interest awarded even though amount due was not ascertained until ruling by court of appeal). That principle does not affect any of the interest awarded here, however. Those amounts on which we have awarded prejudgment interest were fixed by contract and invoices. Although Campesi did dispute his liability to pay some of those amounts—specifically, the purchase price of the semen and the purchase price of the large herd—that dispute was not over how much was due, but whether anything was due at all. Each element of recovery on which we have awarded prejudgment interest was ascertainable at the time it came due.