CHEHARDY, Judge.
Plaintiff, Isadore Carter, appeals from a judgment dismissing his suit in redhibition against defendants, Chrysler Motors Corporation; Chrysler Corporation; Standard Motors, Inc.; and Community Motors, Inc., and dismissing the third party demands of Community Motors, Inc., against Chrysler Corporation; Standard Motors, Inc., against Chrysler Corporation; Chrysler Corporation against Cummins Engine Co., Inc.; and Community Motors, Inc., against Standard Motors, Inc.
The facts of the case were will articulated in the trial court’s reasons for judgment:
“This is a suit in redhibition initiated by plaintiff, Isadore Carter, to recover the purchase price, incidental expenses and damages sustained in connection with his purchase of a new Dodge CNT 800 diesel truck. The truck was purchased from Community Motors, Inc. (hereinafter referred to as Community) in Hammond, Louisiana, on January 29, 1976. Since Community did not ordinarily sell trucks of this size, they contacted Standard Motor Car Company of Baton Rouge, Louisiana (hereinafter referred to as Standard). The salesman from Community, Albert Carter, who was also the brother of Isadore Carter, went with plaintiff to Standard to discuss the purchase of the truck. Community did not ordinarily sell large trucks and made no representations to anyone that they sold, serviced, or recommended the truck chosen by plaintiff or any other large truck. After plaintiff’s decision was made, Community purchased the truck from Standard and then sold it to Isadore Carter. Plaintiff picked the truck up from Standard and drove it to Community where a certificate of title was issued to the plaintiff. The negotiations at Standard were made with Mr. Clyde Moore, one of their salesmen.
“After the purchase of his truck, plaintiff alleges that he has experienced problems with it which would entitle him to a rescission of the sale. The defendants, Community, Standard and Chrysler Corporation (hereinafter referred to as Chrysler), have denied plaintiff’s allegations and contend that plaintiff is neither entitled to a rescission of the sale nor to reduction in purchase price.”
Subsequent to a trial on the merits, the district court judge made the following separate and distinct findings of fact:
“1.
Plaintiff put approximately 15,000 miles on the truck, during the ten (10) months he had it.
2.
The evidence showed a number of persons performing modifications: Fred Cutrer installed the flat bed and the hydraulic lift; Ewell Spurlock changed the wheels; Salvadore Anone put on the fifth wheel and shortened the wheelbase and drive shaft; and Oliver Wells installed and welded the dump body.
3.
Plaintiff did not produce adequate records to show that he properly maintained and serviced the truck.
4.
There were times when plaintiff overloaded the truck.
5.
Plaintiff operated the truck at extended fast speeds.
6.
The plaintiff placed extra large tires on the truck.”
In his reasons for judgment, the trial judge also noted:
“The Court is of the opinion that the truck was capable of performing in accordance with its designed use and that the plaintiff failed to prove that any defect existed at the time of the sale.
“The trouble with the power steering was minor and was repaired at no cost to plaintiff.
*840 “The truck was delivered to Standard for repairs of the clutch in December, 1976, and plaintiff never returned to get it.
“The Court is convinced that the plaintiff’s misuse, abuse, and failure to maintain the truck was the cause of the problems and he cannot recover in these proceedings.”
Counsel for plaintiff, in discussing this observation by the trial court stated:
“Most disturbing of all, however, is the court’s conclusion that ‘plaintiff’s misuse, abuse, and failure to maintain the truck was the cause of the problems.’ It is embarrassing because it is a direct quote from page 2 of Chrysler’s post-trial memorandum, unsubstantiated by any evidence in the memorandum. It is disturbing because the record also fails to reveal any evidence supporting the court’s conclusion and appears to be a misunderstanding of the testimony.”
We do not agree with this expression by the learned counsel for plaintiff. The testimony and the record substantiate the trial judge’s finding that plaintiff’s misuse, abuse and failure to maintain the truck was a principal cause of plaintiff’s problems with the truck.[1]
The plaintiff argues he communicated to the salesman that his main purpose for buying the truck was to haul bricks, and, since this was the principal cause of the contract to purchase the truck, and the salesman was aware that this was the principal cause, then there exists an error in motive sufficient to invalidate the contract of sale, citing Wheat v. Boutte Auto Sales, 355 So.2d 611 (La.App. 4th Cir. 1978). In that case the court stated at page 612:
“The testimony of plaintiff, corroborated by defendant’s salesman, is that he repeatedly expressed to the salesman that he did not want and would not buy a wrecked automobile, thus establishing that the acquisition of a non-wrecked automobile was his principal motive, communicated to the seller. The salesman told him that this car had not been wrecked. An expert’s testimony establishes that the car had been badly wrecked, with evidence of damage in many areas of the car. Thus even if the seller’s declaration were made in good faith, redhibition is expressly available under C.C. 2529 (see also C.C. 1824-1826).”
Plaintiff also cites the case of Cutrer v. Kentwood Motors, Inc., 351 So.2d 817 (La.App. 1st Cir. 1977), which sets forth the applicable law in an action for redhibition:
“In order for plaintiff to maintain his action in redhibition he must prove: (1) that pickup truck was useless for the purpose for which he bought it, (2) that a non-apparent defect rendering the truck useless existed at the time of the sale, and (3) that the seller was given a fair opportunity to repair the defect. LSA— C.C. arts. 2520, 2530 & 2531. Purvis v. Statewide Trailer Sales, Inc., 339 So.2d 403 (La.App. 1st Cir. 1976), Jordan v. LeBlanc and Broussard Ford, Inc., 332 So.2d 534 (La.App. 3rd Cir. 1976).
* # # * * *
“Secondly, the purchaser is not burdened with the impossible task of proving the cause of every defect or difficulty he encounters with a complicated piece of machinery, and it is only sufficient that he merely show their existence. Harris v. Drexier Motor Company, Inc., 339 So.2d 1304 (La.App. 1st Cir. 1976). Proof that the defect existed at the time of the sale can be by either direct or circumstantial evidence giving rise to the reasonable inference that defects existed at the time of the sale. Moreno’s Inc. v. Lake Charles Catholic High Schools, Inc., 315 So.2d 660 (La.1975), and the standard to determine the sufficiency of the evidence is ‘when, taking the evidence as a whole, such proof shows that the fact or causation sought to be proved is more probable *841 than not’. Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151 (1971).” 351 So.2d at 818-819.
Carter’s complaints about the truck centered around troubles with the power steering, consumption of excessive amounts of oil, imbalance of the wheels and malfunction of the clutch. Although he and his wife insisted the truck was only usable for a total of approximately 50 working days during the ten months Carter had this truck in his possession, the evidence of the times the truck was actually laid up for repairs does not bear this out.
John Evans, president of Community Motors, Inc., testified that although he told Carter at the time of the purchase of the truck Community could not service it, he did, indeed, attend to the complaints about the power steering, first brought to his attention by Carter on May 7, 1976, by replacing a valve on the steering. At this time the truck had already been driven 5,904 miles.
Evans also said that according to his records and personal recollection, a new power steering pump was then installed on June 21, 1976, when the odometer indicated 6,357 miles and one more power steering pump was installed on July 2, 1976.
At the trial Evans further explained that, although there was a possibility even one more steering pump was installed in Carter’s truck around that period, these parts were always sent immediately to Community from Chrysler, resulting in an approximate stay of the truck in the shop of three days for each repair. He further stated he had received no further complaints about the steering since the last repair in July and that the plaintiff was not asked to pay for parts or labor on any of the steering repairs.
Regarding excessive use of oil by the truck, plaintiff testified he took the truck on April 9, 1976 to Cummins Engine Co., Inc. Denzil A. Wooton, an employee of Cummins for the past 21 years, testified the truck evidenced a rear bearing leak, which is a random type failure requiring only approximately one day to repair, and which was covered by warranty. In spite of the fact Carter was told by the company to come back when their new facility opened (which occurred the following month), Carter never returned with the truck for repair nor did he ever check to see if the new shop had ever opened.
Both Wooten and Joe Knowles, who was qualified by the court as an expert in the field of maintenance and repair and had extensive training in repair of Chrysler products, testified that a neglect of the repair of the rear bearing oil leak could lead to serious problems with the truck’s clutch.
It is not surprising, therefore, that on December 1, 1976 Carter took the truck to Standard Motors, Inc., complaining of clutch problems. This was the only time the truck had been presented to Standard since the purchase of the truck in January, with the exception of a repair on February 16, 1976, when the truck was sent to Mar-got, Inc., by Standard for the purpose of balancing the front wheels. There was convincing evidence adduced at trial that Standard completed the repairs of the clutch on December 16, 1976 and that this was communicated to the plaintiff at that time. The clutch had been replaced and the clutch slave cylinder had been reconditioned; however, since the truck already had 15,242 miles on it, the terms of the Chrysler warranty required the plaintiff to pay for one-half of the repair bill. He subsequently complained to Evans at Community that he did not have the money to pay for the repairs. The truck, therefore, stayed at Standard until January 20, 1977, when it was seized by the bank which held a mortgage on the truck.
Part of plaintiff’s burden in an action of redhibition includes proof that it is more likely than not that the defect or defects complained of existed in the thing prior to its purchase by the buyer. See Bendana v. Mossy Motors, Inc., 347 So.2d 946 (La.App. 4th Cir. 1977). In the case before us, however, it is obvious, as shown above, the defects complained of did not evidence themselves until months after the purchase; furthermore, we have only the self-serving *842 testimony of the plaintiff himself that such defects existed at times other than the repair dates and that they were more extensive than the repair records indicate.
As to the more likely reasons for the development of the truck’s operational problems, both the plaintiff and his driver testified the truck was driven by them on interstate highways, as well as back roads. A representative of Kentwood Tile Company testified Carter transported loads of up to 12,000 bricks weighing as much as five pounds a brick, or 60,000 pounds, although frequently the loads were less than this amount.
Witnesses at the trial also established Carter had changed the front tires on the truck to highway tires, added a fifth wheel to it so he could attach a dump truck body, and also, at some point, shortened and welded the frame of the truck. These changes in the vehicle were all made by acquaintances of the plaintiff without consulting Community, Standard or Chrysler manuals or representatives. Moreover, there was no evidence the truck had been serviced or maintained by the plaintiff other than his own testimony that he changed the oil and oil filters himself, and his testimony as to how often he performed these services was contradictory.
Knowles, who heard all of the above testimony during the course of the trial, explained that before the hearing he test drove the truck himself, found it to be in good working order with an absence of any steering or clutch problems, and could not designate the truck as a defective vehicle.
In regard to the problems the plaintiff had with the truck, however, he explained the truck in question was a “short haul” vehicle, designed for an around-town top speed of 50 miles per hour and he said the truck’s top hauling capacity was 40,000 pounds.
He characterized the longer highway hauls at up to 55 miles per hour, carrying loads of up to 60,000 pounds, as “owner abuse.” He explained at length that such an overload, especially at high speeds, would strain all components of the truck, shorten its life, and could cause failure of the power steering due to overheating the pump.
Knowles further testified that the welding of the frame had shortened the life of the truck by more than half and that the failure to repair the oil leakage, combined with the overload, could cause a complete clutch failure.
Although Carter first testified he never received an owner’s manual with the truck, he later admitted he had received an “operator’s” manual but had not read it nor did he look at the maintenance schedule.
Knowles explained that regular maintenance on a truck of this size is critical and neglect of such would lead to serious problems. He also added the problems the plaintiff experienced with wobbling wheels and shaking of the steering wheel were probably due to his attempt to run the truck at high speeds on the highway with the front flotation tires with which the vehicle came equipped. He added such tires are not designed for highway driving and balancing them would not correct this problem as long as the truck is driven at high speeds.
' Although all witnesses consistently testified Carter had told representatives at both Community and Standard his purpose in purchasing the truck was to “haul bricks,” Moore testified he specifically told Carter about the load and speed limitations on the vehicle. He further stated he had shown long-haul highway vehicles to Carter, who indicated their price would be a problem for him and opted to purchase the subject vehicle. Furthermore, the fact the vehicle was only licensed to carry a 32,000-pound load is another indication Carter was aware of its load and speed limitations.
In the case of Ditta v. Polk Chevrolet, Inc., 196 So.2d 672, 674 (La.App. 1st Cir. 1967), the court said:
“ ‘(2). It is settled that in an action to set aside a sale on a plea of redhibition where complicated machinery is involved, it is not necessary for the buyer to seek out and prove the particular and underly *843 ing cause of the defect which makes the object sold unfit for its intended use. It is sufficient that he allege and prove that such a defect exists. * * *
“In applying the above principles the courts of this state have held that a plaintiff need only prove that the thing purchased has failed to perform in the manner in which it was intended to perform, and that this failure was under conditions of normal use. * * * ” (Emphasis ours.)
We conclude plaintiff failed to carry his burden of proof that any defect existed in the truck prior to his purchase of it, and furthermore that any problems which developed with the truck were more likely than not the result of the plaintiff’s abuse of the vehicle. We do not find the trial court’s factual findings in this case “clearly wrong,” and in the absence of such a finding we are bound not to disturb them. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
Accordingly, the trial court’s decision is affirmed in all respects.

AFFIRMED.

. Furthermore, we do not find anything reprehensible in a trial judge — or a judge at any level — incorporating in his own reasons for judgment expressions by counsel in their briefs.