**JULIE ANN CORPORATION**

v.

**CESSNA AIRCRAFT COMPANY.**

Civ. A. No. 81–4594.

United States District Court,
E.D. Louisiana.

June 22, 1983.

Michael H. Piper, III, New Orleans, La., for plaintiff.

R.K. Christovich, Christovich & Kearney, New Orleans, La., for defendant.

WICKER, District Judge.

Plaintiff, Julie Ann Corporation, brought this action to rescind the sale of an aircraft manufactured by defendant, Cessna Aircraft Corporation and sold to plaintiff by Houma Aviation Services, Inc., not a party to this action. Plaintiff seeks to recover not only the purchase price of the aircraft, but the costs of repair and maintenance, and attorneys fees.

This case was tried before the Court, sitting without a jury, on a former date. Having considered the pleadings, the evidence adduced at trial, the arguments and briefs of counsel and the applicable law, this Court makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. At all times pertinent hereto, plaintiff, Julie Ann Corporation (hereinafter Julie Ann), a Louisiana corporation with its principal place of business in Louisiana, was engaged in business which included the rental of oil field equipment and various types of vehicles, including boats, automobiles and airplanes.

2. Defendant, Cessna Aircraft Company (hereinafter Cessna), a Kansas corporation, was engaged in the manufacture of aircraft and their component parts.

3. The evidence clearly established that on November 20, 1980, Julie Ann, through its President and sole shareholder, Mr. J.B.N. Morris, purchased from Houma Aviation Services, Inc. (hereinafter Houma Aviation), a 1981 Cessna Pressurized 210 aircraft, registration number N732TZ, serial number P21000594, commonly referred to as a "P210." The purchase price of $178,763.97, consisted of a trade-in credit of $49,131.00 for a 1980 Cessna Cutlass RG II and a cash balance of $129,632.97, paid-in-full on the date of sale. (Plaintiff's Exhibits 1–8)

4. The P210 is equipped with a turbocharger, i.e., an exhaust gas-driven turbine which compresses the air entering the engine and pressurizes the air entering the cabin. This allows the plane to fly faster and higher (without the use of oxygen equipment) than nonturbocharged, or normally-aspirated aircraft.

5. Houma Aviation performed most of the maintenance and repairs on the aircraft. (Plaintiff's Exhibits 10–20)

6. In May of 1981, Cessna introduced its "Performance Plus Program" which consisted of a new turbocharger designed to increase the maximum power of the P210 aircraft. Later, the United States Federal Aviation Administration (hereinafter FAA) issued regulations requiring all P210 aircraft to employ the new turbocharger. (Testimony of Joseph Quackenbush, customer service manager for Cessna) In July of 1981, Houma Aviation installed a new turbocharger system on the P210 in compliance with Cessna's "Performance Plus Program." (Testimony of J.B.N. Morris, Plaintiff's Exhibit 15)

7. After the new turbocharger was installed, problems arose with the aircraft. Morris became dissatisfied and on November 18, 1981, plaintiff wrote to Cessna advising that it intended to rescind the sale. (Plaintiff's Exhibit 58) Although this suit was filed the next day, plaintiff continued to operate the aircraft until February of 1982. At that time, Morris returned the airplane along with the keys, to Houma Aviation and again wrote Cessna of plaintiff's intent to rescind the sale. (Plaintiff's Exhibit 55)

8. The evidence reflects that from the time Morris returned the aircraft to Houma Aviation until the date of trial, the plane remained unattended on the premises of Houma Aviation. Because proper storage procedures were not taken, the aircraft incurred severe damage due to prolonged exposure to the elements. Joseph Quackenbush, Cessna's Customer Service Manager, testified that he examined the P210 on October 7, 1982 and that in his opinion

extensive repair to the cabin, propeller and engine would be needed to render the aircraft airworthy and that these repairs would cost between $12,000.00 and $30,-000.00, depending on whether the engine needed to be replaced.

9. Plaintiff contends that the P210 was defective at the time of sale because exhaust gas temperatures exceeded safe limits during normal operation of the aircraft causing damage to the exhaust system components.

10. It is virtually undisputed that except for minor problems the aircraft performed in a satisfactory manner from the time of its sale until the new turbocharger system was installed in July of 1981. (Testimony of J. Morris) Morris testified that after the system was installed, the new turbocharger failed to function properly; the exhaust system developed cracks, components had to be replaced several times, and the manifold leaked. He also testified that on one occasion after flying the plane, he inspected the engine compartment and found that several hoses, gaskets and wires had burned; that a protective metal plate had melted; the manifold had cracked and that several bolts had become dislodged from their casings and that as a result of these difficulties the plane was grounded for approximately two to three months.

■ 11. I find that plaintiff has failed to prove by a preponderance of the evidence that the problems experienced with the P210 were due to a vice or defect in the design and/or the manufacture of the aircraft but that it is just as likely that the problems occurred as a result of misuse or improper installation and service of the turbocharger.

12. The uncontradicted testimony of Leory D. Burgess, a Cessna engineer who assisted in the design of the P210, and an expert in the field of aviation design and engineering, reflects that type 321 stainless steel is used in the manufacture of the 1981 P210 exhaust system, and in the manufacture of exhaust system components of various aircraft throughout the aviation in-dustry. Burgess testified that the temperature of the exhaust gas may reach 1650° Farenheit and above for brief moments during the period where the pilot adjusts his fuel mixture to obtain maximum fuel efficiency but that these momentary fluctuations could in no way cause damage to the exhaust system, the turbocharger or other engine components. Burgess also testified that although this steel can overheat, i.e., heat to temperatures of 1650° Farenheit and above for prolonged periods of time, this will only occur if the pilot misuses the aircraft by using a fuel mixture which is more lean than that specified in the Pilot's Operating Handbook. (Defendant's Exhibit 3)

13. The Pilot's Operating Handbook is the FAA-approved operation manual for the P210. It is published by Cessna and updated periodically with the latest flight information. Although the handbook was found aboard the plaintiff's aircraft, there is evidence that it was not kept current. Richard Baltera, Cessna's Field Service Representative testified that on one occasion, while inspecting plaintiff's aircraft, he observed that current revisions to plaintiff's handbook had not been inserted but were still in their mailing envelope. He testified that he personally removed these revisions from the envelope and inserted them in the handbook aboard plaintiff's aircraft.

14. Although Randall M. Smith, a pilot and expert with regard to internal combustion engines, testified that he observed that the exhaust gas temperatures on his 1981 P210 reached 1650° Farenheit and above while he was operating under the specifications set out in the Pilot's Operating Handbook, his testimony was vague and based merely on informal observations, while Burgess based his testimony on rigorous in-flight testing conducted by Cessna, during the development of the aircraft and on the endurance tests conducted by Continental Motors during the FAA certification of the P210.

15. Morris was an inexperienced pilot at the time he purchased the P210. Although

Morris testified at trial that he had an experienced pilot with him most of the time that he flew the aircraft, he also testified that he purchased the aircraft with the intent to use the aircraft for flight instruction and that, at that time, he was still in training for an instrument rating.

16. Plaintiff also contends that the P210 is defective because it is not equipped with a gauge which indicates exhaust gas temperature numerically, so the pilot can be alerted to overheating of the exhaust system. I find that the lack of such a gauge does not constitute a defect in the design and/or manufacture of the aircraft. Leroy Burgess testified that such a gauge is not needed because if the pilot operates the aircraft according to the specifications set out in the Pilot's Operating Handbook, the exhaust gas temperature can not exceed safe limits. Moreover, Morris testified that prior to the installation of the turbocharger, the plane performed in a satisfactory manner.

17. Although plaintiff has made vague allegations that the exhaust components were defective because they created an unreasonable risk of carbon monoxide gas leaking into the cabin and/or that the components were not manufactured according to Cessna's own specifications, plaintiff offered no evidence to support these contentions. On the contrary, Leroy Burgess testified that cracks and leaks in the exhaust system components could not cause poisonous gases to leak into the cabin. Burgess further testified that although there was some problem with the manufacturing equipment which caused exhaust system problems in the 1979 model P210 aircraft, this problem was corrected long before the introduction of the 1981 P210.

18. This was substantiated by Joseph Quackenbush, who testified that in the fall of 1980, when the 1981 P210 was first introduced, there were very few complaints concerning exhaust system cracking. He stated that Cessna began to receive such complaints only after the installation of the turbochargers pursuant to Cessna's "Performance Plus Program." Cessna suspected therefore, that the problems were due to improper installation which could cause prestressing of the components. He further testified that the complaints of exhaust system cracking decreased markedly after Cessna issued a Service Letter[1] which provided further information regarding the proper installation of exhaust system components on the P210 aircraft. Moreover, there is evidence of improper servicing of the aircraft at issue. Randall Smith testified that he found evidence of improper installation of the exhaust system components when he examined plaintiff's aircraft on August 25, 1982; specifically, that the riser flange connection nuts were loose on four cylinders, and that on one cylinder, there was one nut completely missing. Morris himself testified that the plane performed adequately until the installation of the turbocharger in July, 1984.

19. Plaintiff attempts to controvert defendant's evidence by citing incidents of exhaust system cracking on other P210 aircraft. It notes that several Airworthiness Directives[2] issued by the FAA in the fall of 1981 required P210 owners to periodically inspect their exhaust systems[3] and that data prepared by Cessna in January of 1982 on the results of those periodic inspections showed that out of 206 aircraft reporting (out of a fleet of approximately 760) 44, or 21% reported incidents of exhaust system cracking.[4] In addition, plaintiff cites the repair records of two P210 aircraft maintained by Cessna as company demonstrators, which show that these air-

---

1. "Service Letters" are issued to organizations which repair Cessna aircraft to provide them with the latest information regarding the repair and servicing of these aircrafts.

2. An "Airworthiness Directive" is issued by the FAA to owners and operators of a particular class of aircraft in order to provide them with the latest information and/or safety require-

ments. Compliance with the safety requirements is mandatory. (Testimony of Randall M. Smith)

3. Plaintiff's exhibits 163–165.

4. Plaintiff's exhibit 110.

craft also experienced incidents of exhaust system cracking.[5]

20. I find that the above statistical data do not support plaintiff's contention that plaintiff's P210 or the turbocharger installed in July of 1981, was defective at the time of sale. The reports cited by plaintiff merely reflect the incidence of exhaust system cracking of P210s; they do not state Cessna was responsible for them.

21. Plaintiff further alleges that Cessna assisted Houma with the installation of the turbocharger and in the repair of the exhaust system components, and therefore, should be held responsible for any problems due to improper installation. I find these contentions to be without merit. Richard Baltera (Cessna's Field Service Representative for an area which included Louisiana, Mississippi, and Eastern Texas, and which contained over 100 P210s) testified that he monitored plaintiff's problems with its aircraft and gave technical advice, mostly over the telephone, to mechanics at Houma Aviation. Baltera also testified that he made a test flight of the aircraft after installation of the new turbocharger. He found that the plane was one inch short on manifold pressure at approximately 14,000 ft. Although in his opinion, this was not significant, he concluded this was due to small leaks in the exhaust system and instructed Houma Aviation how to test the exhaust system for leaks. Plaintiff has offered no evidence that Baltera's advice contributed in any way to the malfunction of its aircraft. On the contrary, there is evidence that Houma Aviation disregarded Cessna's installation instructions. Richard Baltera testified that Cessna refused to file the flange surfaces on the exhaust system components to within .005 of an inch as directed in a Cessna Service Letter. (Plaintiff's Exhibit 139)

22. Moreover, the evidence reflects that Houma Aviation was not an agent of Cessna, nor has plaintiff offered any evidence to show that Cessna and Houma Aviation were other than two separate business organizations. Furthermore, the retail purchase order, which Morris conceded that he read, provided in pertinent part, that:

"... purchaser recognizes that dealer marketing the aircraft products hereunder is an independent business organization and not Cessna's agent and Cessna has no responsibility for dealer's representations or other acts." [6]

Accordingly, plaintiff was placed on notice that Cessna was not responsible for Houma Aviation's installation and/or repair of the turbocharger and/or other components.

23. Finally, plaintiff contends that the P210 was defective due to numerous problems other than those addressed above. Morris testified that the aircraft's performance did not meet the specifications of the 1981 P210 brochure,[7] in that the aircraft had a maximum power limitation of 75% rather than 80% of maximum power, and a fuel consumption rate of 22 rather than 18 gallons per hour. Plaintiff also submits evidence of numerous repairs to the air-conditioner, upholstery, vent window, emergency hand pump, hydraulic pump, fuel gauge, transponder, and to various avionics aboard the aircraft.[8] However, as stated above, Morris himself testified that with the exception of increased fuel consumption, the plane performed to his satisfaction until the replacement of the turbocharger in July, 1981. Accordingly, I find that plaintiff has failed to prove that these defects were sufficiently severe to warrant rescission of the sale or reduction of the purchase price.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction and venue is proper. 28 U.S.C. § 1332; 28 U.S.C. § 1391.

2. Redhibition is the "avoidance of a sale on account of some vice or defect in the thing sold, which renders it either abso-

---

5. Plaintiff's exhibits 75–84.

6. Plaintiff's exhibit 3.

7. Plaintiff's exhibit 243.

8. Plaintiff's exhibits 10–20.

lutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it had he known of the vice." La.Civ.Code art. 2520; *Austin v. North American Forest,* 656 F.2d 1076, 1083 (5th Cir.1981).

3. Under Louisiana law, the purchaser of a thing has a direct right of action against the manufacturer in redhibition. *Austin v. North American Forest, supra,* at 1088, *Rey v. Cuccia,* 298 So.2d 840, 845 (La.1974). The manufacturer is presumed to know of any vices or defects in his products and thus, may be liable for restoration of the purchase price and expenses of the sale, damages occasioned by the defects in the thing purchased and attorney's fees. *Austin v. North American Forest, supra,* at 1084; La.Civ.Code art. 2545.

4. Absent express renunciation, express warranty provisions as stated in the documents of sale or in the manuals have no effect upon this statutory warranty of fitness for intended use. *Gamble v. Bill Lowrey Chevrolet, Inc.,* 410 So.2d 1155 (La.App. 3rd Cir.1982).

5. The plaintiff has the burden of proving that the thing was defective at the time of sale. *Charlie Hairston Aircraft, Inc. v. Beech Aircraft Corp.,* 457 F.Supp. 364, 15 Av.Cas. (CCH) 17,382, 17,384 (W.D. La.1978); *Hawkins v. Camper Village, Inc.,* 404 So.2d 508 (La.App. 1st Cir.1981), *cert. den.,* 409 So.2d 675 (La.1981); *Rankin v. Blanchard,* 349 So.2d 968 (La.App. 1st Cir.1977); *Edelman Systems, Inc. v. Capitol GMC, Inc.,* 345 So.2d 99 (La.App. 1st Cir.1977), *cert. den.,* 347 So.2d 250 (La. 1977); *Dominque v. Whirlpool Corp.,* 303 So.2d 813, 815 (La.App. 3rd Cir.1974); *Segall Co., Inc. v. Rountree Olds Cadillac Co., Inc.,* 270 So.2d 629 (La.App. 2d Cir. 1972); *Womack v. Lafayette Furniture Co.,* 50 So.2d 843 (La.App.Orl.1951).

6. The purchaser is not required to prove the exact or underlying cause of the defect in a complicated piece of machinery; it is sufficient if he proves that at the time of sale, the product purchased was not reasonably fit for its intended use. *Rey v. Cuccia, supra,* at 841 & 844; *Gamble v. Bill Lowrey Chevrolet, Inc., supra,* at 1157.

7. However, if the defect or malfunction in the thing sold did not exist at the time of sale, but arose after the sale because of improper maintenance and/or servicing rendered by a party other than the manufacturer, then the manufacturer is not liable. *Ashley v. Volkswagen of America, Inc.,* 380 So.2d 702, 706 (La.App. 4th Cir.1980); *Bell v. Fiat Distributors, Inc.,* 357 So.2d 607 (La.App. 1st Cir.1978); *Segall Co., Inc. v. Rountree Olds Cadillac Co., Inc., supra.*

8. Likewise, the manufacturer of a thing is not liable for defects caused by misuse of the product. *Carter v. Chrysler Motors Corp.,* 384 So.2d 838 (La.App. 4th Cir.1980), *cert. den.,* 394 So.2d 267 (La. 1980); *Wolff v. Flanagan,* 333 So.2d 663 (La.App. 4th Cir.1976), *cert. den.,* 337 So.2d 223 (La.1976).

9. What constitutes a rehibitory defect is a question of fact. *Ball v. Ford Motor Co.,* 407 So.2d 777, 780 (La.App. 1st Cir.1981); *Newman v. Dixie Sales & Service,* 387 So.2d 1333, 1335 (La.App. 1st Cir. 1980); *Dominque v. Whirlpool Corp., supra,* at 815.

10. The mere introduction into evidence of numerous repair invoices will not establish a *prima facie* case of a defect at the time of sale when other reasonable inferences of equal weight may be drawn from such documentary evidence as to the cause of the defect. *Edelman Systems, Inc. v. Capitol GMC Inc., supra,* at 102–03.

11. The defects complained of may not be sufficiently serious as to justify either rescission of the sale or reduction of the purchase price. *Bell v. Fiat Distributors, Inc., supra,* at 609; *Rankin v. Blanchard, supra,* at 970; *Chrysler Credit Corp. v. Bertrand,* 290 So.2d 350, 352–353 (La.App. 3rd Cir.1974), *cert. den.,* 293 So.2d 192 (La.1974).

12. The purchaser is not legally responsible for deterioration of a defective thing due to disuse following the seller's refusal to comply with its legal obligation to accept the return of the thing if it is defective. *Hebert v. Claude Y. Woolfolk Corp.*, 176 So.2d 814, 818 (La.App. 3rd Cir. 1965). Nor upon the seller's refusal of the defective thing is the purchaser legally obligated to provide garaging or other care to the vehicle. *Id.* n. 4. However, if the problems with the thing do not warrant redhibition, then the buyer continues to own the thing purchased and like any owner, must bear the cost of upkeep. *Morris N. Palmer Ranch Co. v. Campesi*, 647 F.2d 608, 614 n. 4 (5th Cir.1981).

Accordingly, let judgment be entered in favor of defendant, Cessna Aircraft Company and against plaintiff, Julie Ann Corporation, dismissing plaintiff's claim at its cost.