471 So.2d 792 (1985)
LAND AND MARINE SERVICES, INC. and Wilfred M. Beauford, Individually
v.
DIABLO DATA SYSTEMS, INC. OF LOUISIANA, "A" Computer Service, Computer Products International & Computer Services Corporation.
No. 84-CA-668.
Court of Appeal of Louisiana, Fifth Circuit.
May 13, 1985.
Rehearing Denied July 17, 1985.
*794 George Kim Johnson, Baton Rouge, and James D. Maxwell, Kenner, Michael A. Lombard, Metairie, Associate Counsel for plaintiffs-appellees.
C. James Gelpi, New Orleans, for defendants-appellees.
Veronica A. Cubit, Howard E. Sinor, Jr., New Orleans, for defendant-appellant Jones, Walker, Waechter, Poitevent Carrere and Denegre.
Before BOWES, CURRAULT and DUFRESNE, JJ.
BOWES, Judge.
Defendant, Digital Computer Controls, Inc. (hereinafter DCC), has appealed a judgment of the trial court in favor of the plaintiffs, and also granting defendant Diablo's third party demand against them. Plaintiffs, in turn, have cross-appealed the damages award, averring that the judgment is inadequate to compensate them for their losses. Finally, Diablo has answered the appeal, alleging that the attorney's fees granted in its third party demand were insufficient. To sketch the facts, we quote partially from the reasons for judgment:
What seemingly could have been under other circumstances a simple transfer from the originator of the system to the ultimate user became, because of the complexities of modern business, a series of transactions involving to some extent an apparently inordinate number of persons and firms, most of which or whom have been at one time or another parties to this convoluted litigation.
The parties plaintiff are Mr. Wilfred Beauford and Land & Marine Services, Inc., a corporation of which Mr. Beauford is the president, and in which he holds 90% stock ownership. Of the large number of parties impleaded as defendants or third party defendants, those remaining at the close of the trial are: Data General Corporation, Digital Computer Controls, Inc., Diablo Data Systems of Louisiana, Inc., and Compunetics, Inc. Named as plaintiffs are Mr. Wilfred Beauford and Land & Marine Services, Inc.
In April of 1979, Mr. Wilfred Beauford entered into a purchase agreement with Diablo Data Systems of La., wherein the former agreed to purchase and the latter sold a computing system, consisting of hardware, operating system or software, and applications program or software. The computing system was ultimately delivered, *795 and, in July of 1979, Mr. Beauford leased it to Land & Marine Services, Inc., for use in that concern's accounting operation.
As a necessary prerequisite to flesh out these bare facts, the configuration of companies involved in the present matter is described below:
Dan Ellis and Leon Sampere each owned 50% of the stock of Diablo, of which company Ellis was president. Additionally, Sampere and Ellis each owned 50% of the stock in a company called Compunetics, Inc. Compunetics was the "agent company" for Diablo, and one of five corporations which formed another company called Computer Products International, hereinafter referred to as C.P.I. C.P.I. buys computers and software, and, in 1978, became distributor for Data General and Digital Computer Controls (DCC), a wholly-owned subsidiary of Data General. Data General manufactures the hardware, DCC the operations and applications software.
Wilfred Beauford is president of and major stockholder in Land and Marine Services, Inc., a marine insurance investigating and adjusting firm.
In late 1978, and early 1979, Mr. Beauford was faced with a retiring bookkeeper and a steadily growing business. He sought to replace, or perhaps more properly augment, the human element with a computer which would perform bookkeeping services. In February of 1979, the plaintiff made various contacts with a number of dealers, ultimately settling on Diablo Data Systems, Inc. The computer system which interested Mr. Beauford, which was distributed by Diablo, was manufactured by Data General. There was a demonstration of the computer's general functions, given by Leon Sampere. After obtaining from Mr. Beauford information relative to the amount of work (number of bills sent out, number of payroll checks, etc.) involved, Mr. Beauford was told that he needed a ten megabyte computer, with a 64KCPU (Central Processing Unit) and one hundred and twenty line printout.
Beauford was given a master menu detailing the programs available on the computer, which consisted of 12 programs. Sampere gave Beauford estimates on the prices of systems within the range that Land and Marine could afford. Beauford knew that Land and Marine was not in a position to purchase the computer; he determined that he would personally acquire the computer and lease the machine to Land and Marine. The necessary corporate measures were taken to approve this transaction.
In April, 1979, a sales contract between Wilfred Beauford and Diablo was executed. The contract specified the Data General Computer with its accompanying keyboard, printer (manufactured by Texas Instruments), and disk system. Programming for the following applications was also sold: General ledger, accounts payable, payroll, and time and charges billing to accounts receivable.
Once purchased, Roy O'Neil, a systems analyst on behalf of Diablo, began to work with Mr. Beauford to do systems analysis; this was a detailed study of the operations of Land and Marine, and a proposed conversion of the company's manual bookkeeping system into the computer.
As a result of the analysis, O'Neil drew up a set of specifications for a timekeeping system. These specifications were designed "from scratch" by O'Neil, who stated that he assumed there was no software available for that program.
Eddie Crist, a contractor doing systems design and programming for Diablo, was assigned the task of writing the timekeeping program based on O'Neil's notes. Having observed a package known as "Appl-W", manufactured and controlled by DCC, Crist felt that that program was "very close already, and by using the Apple-W (sic), we could decrease significantly the amount of time necessary to generate this package rather than write it from scratch."
Appl-W, according to Barbara Lowig, a former employee of DCC, is a wholesale distribution package "written for warehouse *796 application." Appl-W has an accounting portion, known as Appl-A. Appl-A is specifically geared to a warehouse invoice type of business.
The timekeeping program was far and away the most important part of the programs purchased by Land and Marine. After reviewing the proposals of Mr. Crist, Beauford opined that such a system met approximately 60% of his requirements. It was agreed that the system would be inaugurated, and, once functioning in place, the programmers (Diablo) would proceed to complete the remaining 40% of the plaintiff's requirements.
From the time of the installation of the computer, the system never worked properly. In splendidly-rendered reasons for judgment, the trial judge summed up the nature of the plaintiff's problems with the computer:
From its first application to the business affairs of Land & Marine, the computing system rendered a work product that was totally unacceptable. Data were loaded in, never to be recovered; figures were entered, only to be lost. The general ledger went awry, with accounts receivable and accounts payable data in disastrous state. Neither the timekeeping nor the payroll functions of the system were reliable. Trial balances were impossible to achieve, and financial statements delivered by the system were misleading and useless. Displaying from time to time a seeming awareness that its matrices, analogues, circuits and logic could not handle a set of circumstances with which the device found itself confronted, the equipment would shut itself down and turn itself off, a situation described by witnesses at the trial as "trap zero" and one which required extensive efforts to rectify. Incorrect totals were given by the system; and billings and invoices were incorrectly made by the computer. Coding errors and logic errors were demonstrated. The malfunctions of the system were repetitive, diverse, persistent, recurrent and seemingly ever novel; when one set of symptoms was cleared, another broke out in a different phase of the system.
Mr. Beauford testified that he spent upwards of 2,000 hours attempting to enter information into the computer and work with the system to obtain some usable services. He spent considerable money in these efforts.
Beauford contacted Dr. Victor Law, a professor of computer science at Tulane University for assistance. Dr. Law observed the situation, the computer in action at Land & Marine. He recommended the addition of another information terminal (CRT) and several other "hardware" additions. He further recommended that the timekeeping program be re-written, and other "minor" modifications to the other applications package. In his efforts, Dr. Law was assisted by Chris Clabaugh, a former student with prior experience on Data General equipment. Clabaugh then attempted to correct the timekeeping system. Eventually, he told Mr. Beauford that he would prefer not to try to fix the system, but would rather come up with a new custom package. Thus, he attempted to replace the existing system with another one. However, the system, as of the date of trial, did not function properly. Dr. Law stated that in his opinion the system at the time he examined it was absolutely unsuitable for the purposes of Land and Marine.
Meanwhile, Mr. Beauford was also in communication with personnel from Diablo, who were attempting to put the system into functional condition.
By June of 1980, more than a year after contracting with Diablo and almost one year from the date of installation, Beauford tendered the system back to Diablo. At the time of trial, however, Diablo had failed or refused to accept the tender, and the computer was still in partial use at plaintiffs' business.
Plaintiffs' filed suit originally against Diablo Data Systems, "A" Computer Service; Computer Products International; and Computer Services Corporation. The suit was styled as one in redhibition; and, alternatively, for nullification, breach of *797 contract, breach of warranty, and negligence.
Numerous supplemental and amending petitions and answers thereto were filed, along with voluminous other pleadings. To pare down the pre-trial procedure to its simplest elements, Data General Corporation and Digital Computer Controls, Inc. were made third party defendants by the original defendants, and plaintiffs amended their petition to include Date General and DCC as defendants.
By May, 1982, the pleadings had become so extensive and complex that plaintiffs filed a "Consolidated, Amended and Supplemental Petition in Redhibition and Alternatively For Damages for Breach of Contract and Breach of Warranty", against all previously named defendants.
After trial on the merits, the district court found in favor of plaintiffs and against Diablo, rescinding the sale of the computer system. Further, there was judgment in favor of Wilfred Beauford and against Diablo and DCC in solido for $29,357.96; judgment in the third party demand in favor of Diablo and against DCC in the amount of $29,357.96; judgment in favor of plaintiffs Beauford and Land & Marine for $15,000.00; and judgment in favor of Diablo and against DCC in the sum of $27,294.45.
DCC has assigned the following errors:
I. The trial court erred in finding that the operating system software had inherent defects.
II. The trial court erred in failing to find that the DCC software was not utilized for its intended purpose, thereby relieving DCC of liability.
III. The trial court erred in holding DCC liable as the manufacturer of the applications software purchased by plaintiffs.
IV. The trial court erred in failing to find that modifications to the software by entities other than DCC created defects in the applications software delivered to plaintiffs.
V. The trial court erred in finding that inherent defects in DCC applications software caused problems with plaintiffs' use of the system.
VI. The trial court erred in applying the law of redhibition, as plaintiffs' contract with Diablo with respect to software was a contract "to do", not a contract of sale.
Plaintiffs averred the trial court erred in:
1. Failing to award to plaintiffs costs and damages to which they are entitled as a matter of law.

a. Interest on the purchase price of
 the Data General computer
 system $9,968.73
b. Expenses incurred in futile
 attempts to use and repair the
 defective Data General computer
 system $60,436.28
c. Attorney's fees $31,084.00
d. Legal interest on all sums to
 which plaintiffs are entitled
 (except attorney's fees) from date
 of formal demand; and on
 attorney's fees from date of trial
 court judgment.
e. Supplies purchased to meet
 specific technical requirements of
 Data General computer system. $344.99
f. Profits lost as a result of total
 failure of Data General computer
 system to perform. $25,000.00
g. Recapture of investment tax
 credit on purchase of credit of
 Data General computer system $4,623.00
h. Expert witness fees during trial $1,903.30

2. Failing to award judgment in favor of both Wilfred Beauford and Land & Marine Services, Inc.
Finally, Diablo has asserted in its answer that the award of attorney's fees did not include an amount for trial and trial preparation.
It would be helpful at this point to review the relevant testimony from most of the other witnesses, relative to the presence or absence of a defect in the system.
Our appreciation of the gist of Crist's description of his modification is that the flow of information, as set up in the Appl-W program, was the same basic flow necessary to the envisioned timekeeping program. The system is integrated, utilizing the files that are passed or used between *798 each sub-system. In Appl-W, each sub-system updates the general ledger file, so that all information is integrated or pulled together through the general ledger file. Apparently Crist redesignated the sub-systems to accommodate the timekeeping system, but did not attempt to alter the basic integrity of the program itself.
Several other experienced programmers testified in addition to O'Neil, Clabaugh, and Crist. Tony Morazan, president of Computer Services, Inc., contracted with Diablo to assist the Diablo programmers in implementation of a special system, and in problem solving. He stated that after working with the system installed at Land and Marine, that the major problem in most applications was a loss of record control. Although there were record lodging problems, and other minor difficulties, the inability to control and keep records was the chief concern. This control problem was evident in several applications, not just the modified timekeeping system. An error-detecting program, written by Morazan, revealed that there were no errors in the modifications, but rather the error was in the basic package program, the lines of coding, as originally received from DCC. When the program installed at Land & Marine was checked against the original master printout of the Appl-W program, Morazan's findings were confirmed.
Richard Millet, a former programmer for Diablo, was responsible for the accounting portion of the program at Land & Marine. He spent most of his time, not making modifications, but rather making corrections. The payroll section, the section which was to store and print tax forms and records, the general ledger, and the financial statements sections didn't work. There were "holes" in the program where data would disappear; transactions were constantly being lost. There was no instance in which the modifications done to the Land & Marine package were made so as to cause the program to operate incorrectly.
Steve Greenstein, formerly employed at Diablo, worked on the Appl-W package at Diablo. He examined the system at Land & Marine. He observed logic errors in the basic (unmodified) program. There were coding errors in the cash receipts portion, accounting invoice system, general ledger, payroll, and credit memo sections. These errors included deletion of records, incorrect file "pointers", and packaged index errors.
Ellis stated that Diablo obtained the system from C.P.I., which purchased it in turn from DCC. Diablo or C.P.I. usually buys the program and copies the master package. From that original form, it is "cloned" or copied and designated for certain types of customizing to one particular account or another. In a deposition, Ellis had stated that the software in question would have been revamped by one or more C.P.I. personnel. At trial, however, he was emphatic that the package loaded on at Land & Marine was not previously "revamped" by C.P.I., explaining that there were differences in the applicationsthe Appl-A and Appl-W. In any case, there is no evidence that the basic coding or lines had been changed by anyone at either C.P.I. or Diablo. Ellis further stated that the modifications which were made by Crist in Appl-W was a simple matter of changing words, making substitutes of some of the text file names that were in there.
The defendants', Data General and DCC, expert was Barbara Lowig, a product specialist formerly employed by DCC. When so employed, she tested, enhanced, modified and wrote certain utilities relating to Appl-Win other words, she was writing and creating code. She worked with C.P.I. personnel in New Orleans to train them on the functionality of the Appl-W. She testified that although she did not make any changes to the code, she remembered that the programmers "were changing the screen format and things of that nature" and "they had enlarged the customer code length and the product code length and things of that nature."
*799 Ms. Lowig ran a program in order to compare the original DCC program against the program at Land & Marine. According to her testimony, the comparison program compared line by line, spaces, letters, and numeric characters. Her finding was, basically, that there was a difference between the two. "I found a lot of programs different. I also found programs that were unique, programs that were not on DCC, were not similar to DCC, and were completely different." She also stated that none of the patches (program repairs) created by DCC were in the Land & Marine programs.[1] She stated that it appeared to her that the copyright indications on several programs had been changed. Some DCC copyrights, compared on a line to line basis, with the Land & Marine program, were changed to C.P.I. copyrights. Some other lines showed programs with a DCC copyright to have been changed to indicate "Branton's", an entity unidentified elsewhere in the record.
Ms. Lowig also found that some error handling capabilities of the system had been altered. Whereas in an unmodified Appl-W, a program will abort if it is reading a duplicate record and notify the operator of an error, in the version received by Land & Marine the system would simply go back and read all the other files until it finds that there is no duplicate record. To us, this translates as an error resulting in a loss of time, and not necessarily in the ultimate findings or "conclusions" of the computer. Ms. Lowig went through and discovered numerous differences in the two programs which it is unnecessary to detail at this point. For our purposes, it is sufficient to state that the comparison program as run by Ms. Lowig disclosed the fact that the original DCC application and the application as utilized by Land & Marine were extremely diverse.
We believe, however, that the method used by Ms. Lowig was inaccurate.
On cross-examination, it was discovered that Land & Marine received the Appl-W program numbered 3.1.[2] It was a "fresh copy", with no patches issued at the time it was purchased. For comparison, Ms. Lowig used a 3.1 with all patches, up until the package was revised and released as 4.0. So, essentially, every time a patch was issued and not discovered on the Land & Marine system by Ms. Lowig, this was considered as error or difference. This did not allow for corrections made "in the field", or by a distributor's programmer working on the individual packages. If the Land & Marine line numbering system had changed, due to the countless adjustments made by numerous programmers, Ms. Lowig's system of comparing lines would be patently erroneous. Ms. Lowig admitted that it was very likely that the numbering system had changed, and that, in fact, it would be unusual if it hadn't changed. Yet the method used by Lowig assumed the numbering stayed the same.
Also, Ms. Lowig admitted that there was no way to tell when the alleged copyright changes had been made, or who had made them, or even, in fact, if they had actually been made. No checks were undertaken to ascertain, separate and apart from what the computer print out showed, whether the actual copyright had been obtained by C.P.I. or "Branton".
While Ms. Lowig pointed out, in her testimony, the differences in the "master menus" for the original Appl-W and Land & Marine's version, she failed to point out the similarities, which were in fact much more substantial than the differences. The names of some of the programs were somewhat altered, but were not materially different. *800 Further, there is no indication that the name change was the result of a major modification in the program, or, if so, the nature of the modification is not apparent.
To sum up some other problems gleaned from Ms. Lowig's testimony, we note:
1. The master disk from Diablo was never compared to the original master disk from DCC.
2. A problem in the original program, which existed before any patches were issued, could have filtered down and affected other programs and caused errors (a kind of "domino" effect) in an integrated system.
3. There was only one instance in which a variation in the L & M program caused a problemthe aforementioned error handling function involving duplicate records.
4. The comparison program does not check for error, only for differences in the two programsthere could easily have been basic errors on both disks which would not have been apparent to her.
5. Ms. Lowig evidently did not go into each re-named program to see if they were similar to the original DCC programs.
6. By her own testimony, none of the unique programs affected the operation of the system.
7. There were occasions when an incorrect line on the DCC disk had been corrected on the L & M disk.
In summary, dissecting and comparing the testimony of all witnesses relative to the question of a defect in the manufacture of the software, we find the record amply supports the trial court's conclusion that such defect did exist at the time the components were manufactured by DCC.
The burden of proof in a suit in redhibition was expressed in Carter v. Chrysler Motors Corporation, 384 So.2d 838 (La.App. 4th Cir.1980):
In the case of Ditta v. Polk Chevrolet, Inc., 196 So.2d 672, 674 (La.App. 1st Cir. 1967), the court said:
"`(2). It is settled that in an action to set aside a sale on a plea of redhibition where complicated machinery is involved, it is not necessary for the buyer to seek out and prove the particular and underlying cause of the defect which makes the object sold unfit for its intended use. It is sufficient that he allege and prove that such a defect exists. * * *
"In applying the above principles the courts of this state have held that a plaintiff need only prove that the thing purchased has failed to perform in the manner in which it was intended to perform, and that this failure was under conditions of normal use. * * *" (Emphasis ours.)
The question has been raised as to whether or not plaintiffs attempted to utilize the computer in its normal or expected use. The standard of review here is, of course, that a factual finding of the trial court cannot be disturbed unless that finding is manifestly erroneous and has no reasonable factual basis. Canter v. Koehring, 283 So.2d 716 (La.1973); Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978). We find that the testimony of plaintiff's witnesses is sufficient to establish the requisite factual basis in this case. Several witnesses testified that the problem was inherent in the basic software provided by DCC. The testimony of Ms. Lowig did not soundly rebut those opinions and findings.
DCC manufactured the basic software which was found to have basic or inherent defects. It was not proven to the satisfaction of the trial court, nor to our satisfaction, that the modifications by the subsequent purchasers caused the problems which rendered the computer system essentially unusable for its intended purpose. In the present case, DCC is the ultimate manufacturer and should so be held liable. Therefore, we are unable to find that the trial judge was manifestly erroneous in this conclusion.
It appears that the "Appl-W" program was, indeed, a warehousing and inventory *801 package as originally designed. While defendant has strenuously argued that such a program could not be modified to work as a timekeeping system, DCC has not demonstrated why it could not work. The opinion of Ms. Lowig as to that subject was not supported by explanations or evidence, nor was it supported by the opinion of any other expert. We are unable, then, to conclude with reasonable certainty that it was so unsuitable. Accordingly, there is no basis for the finding urged by defendant that the product was not utilized for its intended purpose.
In an effort to address all assignments of error, and at the risk of being repetitive, we find that the record is replete with testimony that the chief problem with the system is its inability to retain data, or the loss of records"the hole" into which data disappears. The hole was not created or caused by the modifications and occurred in several systems, not just the modified Appl-W. It was inherent in the system. Therefore, we find that these inherent defects caused plaintiff's problems with the use of the system. Plaintiffs carried their burden of proof.
Addressing defendant's last assignment of error, it is clear that a computer system consists of three parts: the hardware, or machinery itself; the operating software, described in the testimony as the "gas" or the "policeman" which tells the computer when to operate; and the applications software which tells the computer what to do and how to do it. None of the components can operate without the others. Plaintiffs purchased the system as a whole. From the testimony, we have derived that the modification of programs to suit a particular client's needs is the norm in the industry. Had those modifications been faulty, or caused the system to be in effect, inoperable, or rendered the system useless for its intended purpose, then DCC may well have been relieved of liability.
Whether or not these modifications were questionably performed, the character of the software as inherently defective is not changed. If this essential component of an integrated system is defective, then the system itself is defective. Whatever contract plaintiffs had with Diablo for applications programming is distinct from the inherent defect found by the trial court, present in the system at its manufacture. The trial court correctly applied the law of redhibition as it pertains to DCC. It would be contrary to the law of redhibition to place the burden of proper performance solely on the dealer in this admittedly complex field. To do so would be to permit the manufacturer to create and market a product without the corresponding responsibility to insure that the system performs its promised functions. In the area of computers, perhaps unlike most other fields with which we are more familiar, that responsibility may very well be a shared one between dealer and manufacturer, and the onus is on one or the other to show that the defect in question was not within his domain. In the present case, we are satisfied that Diablo has, by a preponderance of evidence, carried this burden of proof.
Turning now to plaintiffs' assignments of error, each category of damages will be addressed separately.
The applicable codal articles, to be read in conjunction with one another, are C.C. Arts. 2531 and 2545:
Art. 2531. Liability of seller in good faith for restitution of price
Art. 2531. The seller who knew not the vices of the thing is only bound to repair, remedy or correct the vices as provided in Article 2521, or if he is unable or fails to repair, remedy or correct the vice, then he must restore the purchase price, and reimburse the reasonable expenses occasioned by the sale, as well as those incurred for the preservation of the thing, subject to credit for the value of any fruits or use which the purchaser has drawn from it.
In any case in which the seller is held liable because of redhibitory defects in the thing sold, the seller shall have a corresponding and similar right of action against the manufacturer of *802 the thing for any losses sustained by the seller, and further provided that any provision of any franchise or manufacturer-seller contract or agreement attempting to limit, diminish or prevent such recoupment by the seller shall not be given any force or effect.
Art. 2545. Liability of seller for concealment of vice
Art. 2545. The seller, who knows the vice of the thing he sells and omits to declare it, besides the restitution of price and repayment of the expenses, including reasonable attorneys' fees, is answerable to the buyer in damages.
There is no evidence in the record that Diablo was a bad faith seller under article 2545. Therefore, recovery by plaintiffs from Diablo is limited to restoration of the purchase price, reimbursement of reasonable expenses occasioned by the sale, and expenses incurred in preservation of the computer system. Any additional damages which are found to be due to plaintiffs would be assessed against the manufacturer directly, who is presumed to know the defects, and is therefore deemed to be in bad faith in selling a defective product. Cox v. Lanier Business Products, Inc. 423 So.2d 690 (La.App. 1st Cir.1982).
It is now imperative that the damages claimed by plaintiff be distinguishedthat is, which damages are "expenses occasioned by the sale" and "those incurred for preservation of the thing", which are the "damages" of 2545, for which DCC is directly liable. We also must distinguish the actual costs of the system itself from the price plaintiffs paid for programming.
Concerning plaintiff's action against Diablo, the purchase price of the system, minus any programming charges, was $25,200.00. This amount should have been reimbursed to plaintiff Beauford by Diablo.
Next, Mr. Beauford testified, and corroborated the testimony with documentary evidence, that he obtained a loan from Hibernia Bank to purchase the computer system. Beauford paid $9,968.73 in interest on this loan. In the absence of any contradictory evidence, we find that plaintiff expended $9,968.73 in interest payments over and above the basic price of the system and this amount is an expense of the sale and therefore Mr. Beauford should be reimbursed that amount by Diablo.

Attorney's Fees
The trial court awarded attorney's fees to Diablo, but apparently did not do so with regard to either plaintiff. Near the end of the trial, the amount of attorney's fees billed was a matter of stipulation among all parties. The total billing by plaintiffs' counsel was $31,084.60. Because of the stipulation, and in the absence of evidence to the contrary, we find the fees to be reasonable. This amount was billed to and payable by Land and Marine Services, Inc. Under C.C. Art. 2545, DCC is liable for this amount and the judgment is amended to reflect judgment in favor of Land and Marine Services and against DCC in the full amount of $31,084.60. Plaintiff has furnished no basis to allow us to determine any additional fees for the appeal.
Under Alexander v. Burroughs Corp., 359 So.2d 607 (La.1978), legal interest is due from the date of the tender or formal notice of the cancellation of the sale, with the exception of the amount awarded for attorney's fees. Accordingly, the judgment is amended to reflect that legal interest on the main demand is due from the date of the tender of the computer back to Diablo. Interest on attorney's fees is due from the date of judgment. Alexander, supra.

Expert Fees
The parties stipulated to expert fees in the amount of $1,903.30. Under 2545, this sum is due to Land and Marine and/or Wilfred Beauford, in the respective amounts expended by each, payable by the defendant DCC. Reliable Rubber and Plastic Machinery Co., Inc. v. Wirt Mfg., Inc., 420 So.2d 1232 (La.App. 3rd Cir.1982). This amount will be combined with attorneys' fees, as indicated above.
*803 Expenses Incurred in Attempts to Use and Repair the System
From the evidence in the record and the testimony at trial, we have calculated expenses which Mr. Beauford and Land and Marine expended to be $22,073.00. This sum includes:

Programming $6,000.00
Other reasonable expenses:
Insurance 1,352.00
Maintenance, "A" Computer 900.96
 Service
Maintenance, Computer 1,590.00
 Products Int.
Maintenance, Data General 7,092.54
Set-up Charges 315.00
Dr. Law 2,245.00
Chris Clabaugh 2,120.10
Richard Millet, repairs 374.40
Electrical repairs 83.00 16,073.00
 _________
Total expenses incurred to use and repair $22,073.00
system ==========

All of the above are reasonable expenses occasioned by the sale, or incurred for the preservation of the system, under 2531. Of these charges, Diablo is solely liable for programming costs of $6,000.00, as Diablo and plaintiff had contracted for this programming. The remaining sum, $16,073.00, must also be borne by Diablo, subject to the third party demand against DCC.
We are not convinced from the record that Mr. Beauford suffered a pecuniary loss because of the number of hours he spent attempting to work with the computer. There is no evidence that the company lost money and there is some indication that profits increased. There was no testimony that Mr. Beauford suffered a loss of salary or other income due solely to the time he spent with the computer. We do not find that the evidence supports with any certainty the value of the time spent by Mr. Beauford in working on his computer. In the absence of any such evidence, an award for damages in this instance is inappropriate and we decline to grant such an award.

Loss of Profits
Similarly, neither does the record support a conclusion that Land and Marine suffered a loss of profits due to the faulty computer system. There was, at most, speculation and conjecture on the part of Mr. Beauford that certain amounts were lost because of the computer's inability to keep and maintain records, and generally perform the functions for which it was purchased. These damages were never proven with any particularity, however. Loss of profit awards may not rest on speculation or conjecture unless direct evidence is not available to establish this element of damage. See Al Smith's Plumbing and Heating Service, Inc. v. River Crest, Inc., 365 So.2d 1122 (La.App. 4th Cir.1978). Therefore, an award for lost profits is not supported by the evidence.

Supplies
Because plaintiffs would have been obliged to purchase printing supplies whether the computer was faulty or not; and because we are unable to ascertain from the evidence what portion of the supplies were utilized to their intended result, and which supplies may have been ruined through the defective system, an award in this category is not justified.
Recapture of Investment Tax Credit
Plaintiff received an investment tax credit at the time he purchased his computer system. The credit was a tax advantage which plaintiff received due to his purchase of the system. Plaintiff argues that because the system was not retained in use the requisite number of years required by the Internal Revenue Service (assuming the system will be returned to Diablo), that he will now have to pay in taxes the amount that he received as an investment tax creditand he wishes to recapture this amount of taxes by an additional award in this judgment. Having to pay this tax essentially places plaintiff in the same position he was in before the purchase, which is the purpose behind the redhibition laws. Smith v. Max Thieme Chevrolet Co., Inc., 315 So.2d 82 (La.App. 2nd Cir.1975). An award in this category would therefore work to place the plaintiff *804 in a better position than before the sale, which is not the purpose here. We deny judgment in this category.
It is apparent to this court that the attorney's fees already awarded by the trial court in favor of Diablo Data Systems and against DCC are sufficient to recompense counsel for those days of trial for which it claims additional fees. This matter is within the discretion of the trial court and will not be disturbed on appeal in the absence of manifest error.
We are unable to glean from the record the foundation for the $15,000 award to Mr. Beauford and against DCC. However, we believe we have incorporated all portions of all bases for judgment in this opinion, including whatever basis the trial judge used in this portion of the judgment. Having found no separate basis for this award and believing that this amount is incorporated in other sums awarded herein, we annul this separate award.
In accordance with all the foregoing reasons, the judgment appealed from is affirmed and amended in the following particulars: We award judgment in favor of plaintiff Beauford and against Diablo Data Systems and DCC in the amount of $9,968.73, the interest paid on the personal loan to purchase the computer. Further, we award judgment in favor of Land and Marine and Wilfred Beauford, and against Diablo and DCC, jointly and in solido, in the amount of $16,073.00, as explained previously; and in favor of Land and Marine and Wilfred Beauford and against DCC in the amount of $31,084.60 for attorneys' fees and $1,903.30 for experts' fees; and judgment is granted in favor of Land and Marine and against Diablo in the amount of $6,000.00 for programming costs.
The portion of the trial court judgment rescinding the sale of the computer system is affirmed.
It is further ordered, adjudged and decreed that there be judgment on the third party demand in favor of Diablo Data Systems of Louisiana, Inc. and against Digital Computer Controls, Inc. in said amount of $51,241.73 (consisting of $25,200, the purchase price; $9,968.73 in interest; and reasonable expenses of $16,073.00); together with legal interest and costs of these proceedings.
That portion of the judgment in favor of Diablo Data Systems, Inc. of Louisiana and against Digital Computer Controls in the full and true sum of $27,294.45 is affirmed.
That portion of the judgment against DCC awarding $15,000.00 to Wilfred Beauford is annulled and set aside, for reasons set forth above.
Each party will bear its own costs of these proceedings.
AMENDED, ANNULLED AND SET ASIDE IN PART, AND AFFIRMED AS AMENDED.
NOTES
[1] It is normal in the industry to patch, or correct a program. The patch essentially fixes the program in an area in which a problem has been discovered.
[2] The programs are named and numbered with revision numbers. For example, there is an Appl-W program numbered 3.0. After a period of time, corrections and changes necessary in the program accumulate; some enhancements are made, some improvements are worked into the system, and the application will be renumbered or revised to 3.1. A syst-version of a program displays the original released product and the patches.